Mark J. EVANS, M.D.; Northland Family Planning Clinic, Inc.; Northland Family Planning Clinic, Inc.–West; Northland Family Planning Clinic, Inc.–East; Dennis D. Christensen, M.D., Plaintiffs,

v.

Frank J. KELLEY, Attorney General of the State of Michigan; Harold Sauer, M.D., Chair, Michigan Board of Medicine; Richard Griffin, D.O., Chair, Michigan Board of Osteopathic Medicine and Surgery; Kathleen M. Wilbur, Director, Michigan Department of Consumer and Industry Services; and John D. O'Hair, Prosecuting Attorney for Wayne County, Defendants.

No. 97–CV–71246–DT.

United States District Court,
E.D. Michigan,
Southern Division.

July 31, 1997.

Paul J. Denenfeld, Elizabeth L. Gleicher, Detroit, MI, Louise Melling, Eva Gartner, New York City, for plaintiffs.

Michael C. McDaniel, Lansing, MI, for defendants.

**OPINION AND ORDER SETTING FORTH THE COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW AND GRANTING DECLARATORY AND INJUNCTIVE RELIEF**

ROSEN, District Judge.

## I. INTRODUCTION

This matter is before the Court pursuant to Fed. R. Civ. Pro. 65 following a trial on the merits of Plaintiffs' Complaint for injunctive and declaratory relief. At issue is Michigan's "partial birth abortion" statute, Public Act 273, codified at M.C.L. §§ 333.17016, 333.17516, 333.16221(*l*) and (m), and 333.16226. Plaintiffs request that the Court enjoin the Michigan statute and declare it unconstitutional on the grounds that it (1) is vague and overbroad; (2) imposes an undue burden on a woman's right to choose to have an abortion; and (3) under applicable Supreme Court precedent, is otherwise constitutionally insufficient.

During the course of a three-day bench trial conducted on May 5–7, 1997, the Court heard testimony from nine witnesses, including Plaintiffs Mark I. Evans, M.D. and Dennis D. Christensen, M.D.;[1] Renee Chelian, the administrator of Plaintiffs Northland Family Planning Clinics; Plaintiffs' experts Carolyn Westoff, M.D.,[2] "Dr. Doe", and Stanley Henshaw, Ph.D.; Defendants' experts Harlan R. Giles, M.D. and Curtis Cook, M.D.; and court-appointed expert, Timothy R.B. Johnson, M.D., and received into evidence numerous exhibits. The Court also heard oral argument from counsel.

The parties subsequently filed Post–Trial Briefs on June 10, 1997, and the Court permitted amicus curiae briefs to be filed by the American College of Obstetricians and Gynecologists ("ACOG") and the National Right to Life Committee & Right to Life of Michigan, Inc. on June 13 and 25, 1997, respectively.

## II. ISSUES PRESENTED

Plaintiffs have advanced three arguments for invalidating the Michigan "partial birth abortion" statute. First, Plaintiffs argue that the Michigan statute is unconstitutionally vague. Specifically, Plaintiffs contend that the statute does not provide physicians with adequate clear notice of the specific procedure or procedures proscribed by the law. They also contend that the Act is subject to multiple and confusing interpretations and can be read to encompass a number of abortion procedures, including well-established procedures that are commonly used and accepted in the medical community. Plaintiffs further contend that the Act's ambiguity is compounded by the absence of any intent requirement.

Closely related to this vagueness argument is Plaintiffs' contention that the statute on its face is unconstitutionally overbroad because it sweeps within its proscription substantially all second-trimester pre-viability abortion procedures which, under existing Supreme Court precedent, are protected by the Constitution. Plaintiffs argue that the Act has the purpose and effect of imposing an undue burden on women seeking post-first-trimester abortions in Michigan because it will push women from safer to riskier procedures, violate their right to bodily integrity, and will otherwise delay or wholly thwart their abortions.

Third, Plaintiffs argue that the Act's single exception "to save the life of a pregnant woman" is constitutionally insufficient because it makes no exception for procedures necessary to protect a woman's health.

Defendants counter that the Act simply prohibits only one particular method of abortion and is not so vague that it can be read to include other, permissible methods of abortion. They further dispute Plaintiffs' contention that the statute lacks an intent requirement and argue that the Act *does* contain an intent requirement by implication and by reference.

---

1. Dr. Evans also testified as an expert in obstetrics and gynecology and as a provider of abortion services. Similarly, Dr. Christensen testified as an expert in abortion practice.

2. Dr. Westoff testified by way of a video-teleconference *de bene esse* deposition on May 1, 1997 in which trial counsel and the Court participated.

Defendants also contend that the Act does not impose an undue burden on the woman's right to an abortion since other alternative procedures remain available. With respect to Plaintiffs' argument that the Act is unconstitutional because it does not contain an exception for the health of the mother, Defendants argue that it is not constitutionally insufficient because the exception in the statute—that a physician may perform a partial birth abortion if the physician "reasonably believes that performing the partial birth abortion is necessary to save the life of a pregnant woman whose life is endangered by physical disorder, physical illness or physical injury"—encompasses both life *and* health.

Having heard the testimony of the witnesses and the oral arguments of counsel, and having reviewed and considered the exhibits submitted at trial, as well as the parties' post-trial briefs and the *amicus curiae* briefs of the American College of Obstetricians and Gynecologists and the National Right to Life Committee & Right to Life of Michigan, Inc., the Court makes the following findings of fact and conclusions of law. To the extent that any findings of fact constitute conclusions of law, they are adopted as such. To the extent that any conclusions of law constitute findings of fact, they are so adopted.

## II. *FINDINGS OF FACT*

### A. *THE PARTIES*

#### 1. *Plaintiffs*

##### (a) Dr. Mark Evans

Plaintiff Mark Evans, M.D., is a board-certified obstetrician/gynecologist and clinical geneticist. He is affiliated with Wayne State University and Hutzel Hospital in Detroit, Michigan where he is a professor and the vice-chair and vice-chief of Obstetrics and Gynecology. He is also responsible for Hutzel Hospital's prenatal program and serves as the associate director of Wayne State Medical School's Center for Molecular Medicine and Genetics and head of the Center for Fetal Diagnosis and Therapy.

Dr. Evans' clinical practice in his various capacities includes providing prenatal genetic counseling and diagnostic services. He also provides fetal therapy, including fetal surgery. He testified that, in the course of his practice, he also delivers babies, performing between 50 and 100 deliveries per year.

Dr. Evans also performs abortions at Hutzel Hospital. He testified that he performs approximately 50 abortions annually, approximately 95% of which are performed in the second trimester, between 12 and 24 weeks lmp (i.e., since the woman's last menstrual period). In approximately half of the second-trimester abortions he performs, Dr. Evans uses the induction method; in the other half, he uses the dilation and evacuation ("D & E") method.[3]

##### (b) Dr. Dennis Christensen

Plaintiff Dennis Christensen, M.D. is a board certified obstetrician and gynecologist. He is an assistant clinical professor at the University of Wisconsin where he teaches abortion procedures. Dr. Christensen is also in private practice in Wisconsin and Michigan. His Wisconsin practice is at the Madison Abortion Clinic in Madison, Wisconsin. He practices in Michigan at the Michiana Abortion Clinic in Niles, Michigan.

Dr. Christensen testified that, during the course of his career, he has performed over 60,000 abortions, approximately 85% of which have been first trimester abortions. The remaining 15%—approximately 9,000 abortions—were performed in the second trimester.

At the Michiana Abortion Clinic, Dr. Christensen performs abortions for patients who are from seven to twenty weeks pregnant. All but a few of the second trimester abortions Dr. Christensen has performed were done by the D & E method. He has used the intact dilatation and extraction ("intact D & E") procedure "less than a dozen" times over the course of his career.

##### (c) Northland Family Planning Clinics

The three Northland Family Planning Clinic Plaintiffs—Northland Family Planning

---

**3.** The various abortion procedures are explained *infra* in this Opinion and Order.

Clinic in Southfield, Michigan; Northland Family Planning Clinic—West in Westland; and Northland Family Planning Clinic—East in Clinton Township—provide pregnancy terminations, pregnancy testing, and family planning services. In 1996, 4,731 abortions were performed at the three clinics. The Southfield clinic does abortions up to 24 weeks lmp. At the clinics in Westland and Clinton Township, abortions are performed through the sixteenth week, only. Of the 4,731 abortions performed at the clinics in 1996, 90% were first trimester abortions. The remaining were second trimester abortions, 8% being performed between 13 and 16 weeks lmp and 2% between 15 and 20 weeks. Although in the past, second trimester abortions were done at the Northland Clinics using induction methods, the conventional D & E method has been the only method used for second trimester abortions at the Northland clinics since 1988. The intact D & E procedure is not used at any of the clinics.

## 2. *Defendants*

Defendant Frank J. Kelley is the Attorney General of the State of Michigan. He is responsible for enforcement of Michigan's "partial birth abortion" statute. Defendant Douglas Mack, M.D. is the chairman of the Michigan Board of Medicine which is charged with disciplining physicians for violating the statute. Defendant Susan Roso, D.O., is the chairperson of the Michigan Board of Osteopathic Medicine which is charged with disciplining doctors of osteopathy for violating the statute. Defendant Kathleen M. Wilbur is the Director of the Michigan Department of Consumer and Industry Services which is responsible for investigating and reporting physicians who are alleged to have violated the statute. Defendant John D. O'Hair is the prosecuting attorney for Wayne County, Michigan. He is responsible for criminal enforcement of the statute in Wayne County.

## B. *WITNESSES*

In addition to Dr. Evans and Dr. Christensen, the Court heard the testimony of the following witnesses.

## 1. *Plaintiffs' Witnesses*

### (a) Carolyn Westoff, M.D.

Dr. Carolyn Westoff testified as one of Plaintiffs' expert witnesses. The Court recognized Dr. Westoff as an expert under Fed. R.Evid. 702 to testify both as an obstetrician/gynecologist and as an epidemiologist regarding the relative safety of abortion procedures. Dr. Westoff is a obstetrician and gynecologist licensed to practice medicine in the State of New York. She has been a board-certified obstetrician and gynecologist since 1986.

In addition to her medical degree, Dr. Westoff has a master's degree in epidemiology. Currently, Dr. Westoff is an Associate Professor of Obstetrics and Gynecology and Public Health at Columbia University and an associate attending physician on staff at the Columbia Presbyterian Medical Center. She has published numerous articles in peer-reviewed and other academic journals.

Dr. Westoff testified that over the last 20 years, she has performed approximately 1,000 first trimester abortions and 500 second trimester abortions. Her current practice is limited to first trimester abortions which she performs using both vacuum aspiration and medical termination procedures. She testified that of the approximately 1,000 first trimester abortions she has performed, approximately 700 have been done by vacuum aspiration and 300 have been medical terminations. With respect to the 500 second trimester abortions Dr. Westoff has performed, she testified that in approximately 400 cases have been inductions and the remaining 100 were D & Es. With respect to intact D & Es, Dr. Westoff testified that she never has personally performed an intact D & E, but she has observed the procedure done four or five times.

### (b) Dr. Doe [4]

Dr. Doe testified as Plaintiffs' expert in dilatation and evacuation procedures. Dr. Doe is a licensed obstetrician/gynecologist in

4. Because Dr. Doe had expressed serious concerns about his personal security, he was permitted to testify anonymously.

a large metropolitan area. He has been board certified for more than 30 years. Although he had an active gynecology practice in the past, he now has a private practice limited to doing abortions after the first trimester for high-risk women. He also teaches abortion procedures at a medical school which has an affiliation with a municipal hospital.

Dr. Doe testified that he performs more than 1,000 second trimester abortions each year. He uses the D & E method almost exclusively, and over the last 15 years, "hundreds" of the abortions he has performed have been intact D & E procedures.

### (c) Renee Chelian

Renee Chelian has been the administrator of the three Northland Family Planning Clinics for more than 20 years. She oversees all clinic operations including setting policies, standards and guidelines; arranging for staff training; setting protocols; overseeing counseling; and assuring compliance with applicable laws and regulations.

### (d) Stanley Henshaw, Ph.D.

Dr. Stanley Henshaw testified as Plaintiffs' expert in reproductive health epidemiology. Dr. Henshaw is the deputy director of research at the Alan Guttmacher Institute in New York ("AGI"). AGI is a non-profit research corporation that is concerned with issues of reproductive health, including fertility control, family planning, abortion, prenatal care, infertility, and sexually transmitted diseases. During his nearly 20-year affiliation with AGI, Dr. Henshaw has done approximately 20 quantitative studies relating to abortions, primarily concerning accessibility of abortion services, reasons for abortions, and the conditions under which abortion services are provided, and has published more than 50 articles concerning these matters in peer-reviewed journals.

### 2. *Defendants' Witnesses*

### (a) Harlan Giles, M.D.

Dr. Harlan Giles testified as one of Defendants' expert in the field of high-risk obstetrics, including the termination of pregnancies through abortions. Dr. Giles is a board-certified obstetrician/gynecologist with a sub-specialty board-certification in maternal-fetal medicine. He is a professor at the Medical College of Pennsylvania where he teaches first and second trimester abortion techniques: suction dilatation curettage, inductions and conventional dilatation and evacuation. Dr. Giles also runs high-risk obstetrical clinics in Erie and Altoona, Pennsylvania and he has hospital privileges at several hospitals in the Pittsburgh area where he performs first and second trimester abortions. He testified that for second trimester abortions, he uses the conventional D & E method from 13 to 16 or 17 weeks. Beyond 18 weeks, however, he uses almost exclusively an induction method.

### (b) Curtis Cook, M.D.

Dr. Curtis Cook is a Michigan-licensed obstetrician/gynecologist who testified as Defendants' second expert in the field of obstetrics and gynecology concerning high-risk pregnancies, including the termination of such pregnancies. Dr. Cook obtained his board certification in obstetrics and gynecology in November 1996. He is affiliated with the Michigan State College of Human Medicine, where he teaches obstetrics and gynecology at various hospital locations. Dr. Cook is a member of the American College of Obstetricians and Gynecologists, the American Association of Pro–Life Obstetricians and Gynecologists ("AAPLOG") and the Christian Medical and Dental Society. He is also a co-founder of the Physicians Ad Hoc Coalition for Truth ("PHACT"), an organization dedicated to providing information describing "the risk and concerns" of partial-birth abortions. Dr. Cook testified that he has performed less than a dozen abortions involving live fetuses, all by induction. He has never performed a first trimester abortion or a second trimester D & E.

### 3. Court–Appointed Witness

### (a) Timothy R.B. Johnson, M.D.

Dr. Timothy Johnson was the Court's appointed expert who provided testimony in obstetrics and gynecology, abortion practice,

and the epidemiology of obstetrics and gynecology. Dr. Johnson is board-certified in obstetrics and gynecology, with a sub-certification in the area of maternal-fetal medicine. Dr. Johnson is the Chair of the Obstetrics and Gynecology Department at the University of Michigan Medical School where he is a professor of Obstetrics and Gynecology and holds an endowed chair. He also has an appointment as a research scientist in the Center for Human Growth and Development and an appointment as professor of Women's Studies in the College of Literature, Science and the Arts. Dr. Johnson also practices out of the University of Michigan Medical Center. He sees obstetric and high-risk pregnancy patients, and also practices general gynecology.

Dr. Johnson has an extensive background in obstetrics and gynecology which pre-dates his U of M Medical Center affiliation. He is the former Director of the Maternal Fetal Medicine Division of the Department of Obstetrics and Gynecology at the Johns Hopkins University School of Medicine. At Johns Hopkins, Dr. Johnson also served as the Director of the Fetal Assessment Center and the Director of Residency Training in the Department of Obstetrics and Gynecology.

Prior to his Johns Hopkins affiliation, Dr. Johnson served as the Chief of Obstetrics at the U.S. Air Force Keesler Medical Center. He also served as the Director of the Maternal–Fetal Medicine Fellowship Program of the Uniformed Services University of Health Sciences at Bethesda Naval Hospital, Walter Reed Army Medical Center and the Malcolm Grow U.S. Air Force Medical Center. He has published more than 100 articles in peer-reviewed journals and has co-authored 30 books concerning high-risk pregnancy, fetal assessment and related matters.

As part of his current teaching responsibilities at the University of Michigan, Dr. Johnson teaches about the medical aspects of abortion. He also performs abortions in cases in which major congenital malformations are presented, most often in the second trimester. Generally, these abortions are done using induction techniques. He has also performed conventional D & Es, but has not performed an intact D & E.

### C. *THE CHALLENGED STATUTE*

M.C.L. §§ 333.17016 and 333.17516 contain the substantive statutory provisions of Public Act 273 which ban "partial-birth abortions".[5] The Act provides as follows:

**Partial-birth abortions, prohibition; exceptions; definitions**

(1) Except as otherwise provided in subsection (2), a physician or an individual performing an act, task, or function under the delegatory authority of a physician shall not perform a partial-birth abortion, even if the abortion is otherwise permitted by law.

(2) A physician or an individual described in subsection (1) may perform a partial-birth abortion if the physician or other individual reasonably believes that performing the partial-birth abortion is necessary to save the life of a pregnant woman whose life is endangered by a physical disorder, physical illness, or physical injury and that no other medical procedure will accomplish that purpose.

(3) This section does not create a right to abortion.

(4) Notwithstanding any other provision of this section, a person shall not perform an abortion that is prohibited by law.

(5) As used in this section:

(a) "Abortion" means the intentional use of an instrument, drug, or other substance or device to terminate a woman's pregnancy for a purpose other than to increase the probability of a live birth, to preserve the life or health of the child after live birth, or to remove a dead fetus. Abortion does not include a procedure to complete a sponta-

---

5. The two sections—17016 and 17516—are identical. The double codification results from the division in Article 15 of the Public Health Code of separate statutes for "Medicine" (Part 170) and for "Osteopathic Medicine and Surgery" (Part 175). Thus, Section 17016 is directed at medical doctors and Section 17516 is directed at doctors of osteopathic medicine. For convenience, the challenged statutory provisions are referred to in this Opinion and Order in the singular as "the statute".

neous abortion or the use or prescription of a drug or device intended as a contraceptive.

(b) "Fetus" means an individual organism of the species homo sapiens at any time before complete delivery.

(c) "Partial-birth abortion" means an abortion in which the physician or individual acting under the delegatory authority of the physician performing the abortion partially vaginally delivers a living fetus before killing the fetus and completing the delivery.

M.C.L.A. §§ 333.17016; 333.17516 (West Supp.1997).

The statute's prohibition against "partial birth abortions" is not limited to post-viability or "late term" abortions, and, as set forth *infra*, the expert testimony uniformly established that the statute's language applies to post-first trimester, pre-viability procedures.

Public Act 273 also amended Section 16221 of the Public Health Code to include violations of sections 17016 and 17516 among the enumerated grounds for professional disciplinary action, *see* M.C.L.A. § 333.16221(m) (West Supp.1997). The Act also amended Section 16226 (the disciplinary sanctions provision) to provide as professional disciplinary sanctions for violation of sections 17016 or 17516 "revocation or denial" of a physician's license to practice medicine. M.C.L.A. § 333.16226(*l*) (West Supp.1997).[6]

In addition to rendering the doctor subject to professional disciplinary action, a violation of Section 17016 or Section 17516 also carries with it criminal sanctions. M.C.L. § 333.16299 provides:

A person who violates or aids or abets another in the violation of this article [Article 15 of the Public Health Code] other than those matters described in sections 16294 and 16296 [unauthorized practice of a health care profession] is guilty of a misdemeanor, punishable as follows:

(a) For the first offense, by imprisonment for not more than 90 days, or a fine of not more than $100.00, or both.

(b) For the second or subsequent offense, by imprisonment for not less than 90 days nor more than 6 months, or a fine of not less than $200.00 nor more than $500.00, or both.

M.C.L.A. § 333.16299.

### D. *LEGISLATIVE HISTORY OF THE STATUTE—H.B. 5889*

When the partial-birth abortion legislation was originally introduced in the Michigan House of Representatives on May 21, 1996, subsection (1) of the bill (House Bill 5889)[7] did not have the prefatory "except as provided in subsection (2)" language. Instead, the bill provided a complete prohibition against performing partial birth abortions with no statutory exceptions,[8] and subsection (2) provided an "affirmative defense" as follows:

(2) It is an affirmative defense to disciplinary proceedings initiated under this article against a physician or other individual described in subsection (1) for a violation of section 16221(m) that the physician or other individual reasonably believed all of the following:

(a) that a medical emergency existed when the partial-birth abortion was performed.

(b) no other procedure would resolve the medical emergency.

H.B. 5889, as introduced May 21, 1996 (Text available on WESTLAW, MI–BILLS Database).

"Medical emergency" was defined in the original version of H.B. 5889 as follows:

"Medical emergency" means that condition which, on the basis of the physician's good

---

**6.** Section 16226 enumerates the specific sanctions to be applied for violations of each of the 13 sanctionable actions enumerated in section 16221, including violations §§ 17016 and 17516. For violations of sections 17016 and 17516, the sanction is "revocation or denial" of license.

**7.** An identical bill was introduced in the Senate (S.B.1029). [Stipulated Legislative History, Plaintiffs' Ex. 29, p. 87.]

**8.** Section 1 of the original bill provided:

A physician or an individual performing an act, task or function under the delegatory authority of a physician shall not perform a partial-birth abortion, even if the abortion is otherwise permitted by law.

faith clinical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function.

*Id.*[9]

The bill was referred to the House Committee on Human Services. The Committee moved to adopt a substitute bill which deleted the "medical emergency" affirmative defense, and recommended that it be replaced with an affirmative defense which provided substantially the same language as what was ultimately adopted as an express exception to the ban:

It is an affirmative defense to disciplinary proceedings initiated under this article against a physician or other individual described in subsection (1) for a violation of section 16221(m) that the physician or other individual reasonably believed that performing *the partial-birth abortion was necessary to save the life of a pregnant woman whose life was endangered by a physical disorder, physical illness, or physical injury* and that no other medical procedure would accomplish that purpose.

*See* Stipulated Legislative History, Plaintiffs' Ex. 29, pp. 10, 31–34. *See also,* H.B. 5889, version recommended as substituted from Committee, May 28, 1996 (Text available on WESTLAW, MI–BILLS Database).[10]

The Committee's recommended substitute bill was read to the full House on May 29, 1996, and accepted. 55 Journal of the House, State of Michigan at 1331 (May 29, 1996)

(hereafter referred to as "House Journal"), [Plaintiffs' Ex. 29, p. 12.] After the substitute bill was read, a number of amendments were proposed on the floor of the full House. House Journal at 1331–1343 [Plaintiffs' Ex. 29, pp. 12–26].

Amendments proposed and adopted by the full House include: (1) changing the "disciplinary proceedings" and "affirmative defense" part of the statute to provide the "prohibition" and "exception" language (as it exists in subsections 1 and 2 of the statute as ultimately enacted), House Journal at 1343:(2) adding the provision that the term "abortion" does not include "a procedure to complete a spontaneous abortion", *id.* at 1332; and (3) deleting "suspension" from the list of professional disciplinary sanctions available for violation of the Act, leaving only "revocation or denial" of license as sanctions which may be imposed. *Id.* at 1331. [*See* Plaintiffs' Ex. 29, pp. 12–13; 24.]

During consideration of the bill by the full House of Representatives, several amendments were proposed and rejected with respect to the definition of "partial-birth abortion":

(1) An amendment limiting the term "partial-birth abortion" (and, hence, the prohibition against it) to abortions *"performed at 24 weeks of gestation or later"* was rejected, 56–44. House Journal at 1333–1334;

(2) An amendment replacing the "partially vaginally delivers a living fetus before killing the fetus and completing the delivery" language in the definition with *"performs a totally intact vaginal delivery of a fetus up to the level of the fetal head followed by an*

---

**9.** The original bill's amendment to Section 16226's disciplinary sanction provisions also provided for "suspension, revocation or denial" of license; however, only the two more severe sanctions—"revocation and denial"—were ultimately adopted. *Id.* In addition to these professional disciplinary sanctions, existing law (§ 333.16299) already provided that any violation "of this Article [i.e., Article 15 of the Public Health Code]" constitutes a misdemeanor subject to the criminal penalties provided in section 16299. Violations of the partial birth abortion statute [§§ 17016 and 17516] were added to the list of prohibited actions subject to the criminal penalties in § 16299. *Id.*

**10.** Several amendments to the substitute bill were proposed during Committee consideration, including, replacing the "save the life of a pregnant woman" language in the affirmative defense with "protect the life or health [of. a pregnant woman]"; limiting the ban on partial birth abortions to abortions "performed at 20 weeks of pregnancy or later"; replacing the "partially vaginally delivering" language with "perform[ing] a totally intact vaginal delivery of a fetus up to the level of the fetal head followed by an incision into the fetal skull to remove the contents of the skull to complete the procedure". Each of these amendments was rejected by the Committee. [*See* Stipulated Legislative History, Plaintiffs' Ex. 29, pp. 32–34.]

incision into the fetal skull to remove the contents of the skull to complete the procedure", was rejected 52–47. *Id.* at 1334–1335;

(3) An amendment replacing the term "partial-birth abortion" throughout the bill with *"an intact dilatation and extraction"* was rejected. 54–47. *Id.* at 1339–1340; and

(4) An amendment adding a new paragraph to provide *"This section does not prohibit medical procedures other than intact dilatation and extraction that may be medically necessary to perform a third trimester abortion"* was rejected. 57–42. *Id.* at 1338–1339. [*See* Plaintiffs' Ex. 29, pp. 14–16; 17–21.]

With respect to the single exception to the ban against partial-birth abortions for an abortion "necessary to save the life of a pregnant woman" several amendments were proposed expanding that exception to also cover the "health" of the mother in some form, all of which were rejected:

(1) An amendment adding "or necessary to preserve the physical health" of a pregnant woman, was rejected by a vote of 59–43. 55 House Journal at 1333;

(2) An amendment adding "or to preserve a pregnant woman's ability to bear children in the future where there is no possibility that the fetus can be viable outside the womb" was rejected, 56–46. *Id.* at 1335–1336;

(3) An amendment adding "or to prevent damage to the woman's reproductive system that would result in the inability to bear children" was rejected, 54–44. *Id.* at 1337–1338; and

(4) An amendment replacing the entire exception with the "medical emergency" language as was in the bill when it was initially

introduced was rejected, 54–44. *Id.* at 1342. [*See,* Plaintiffs' Ex. 29, pp. 14: 16–19; 23.]

The bill ultimately passed in the House upon its third reading (which was held immediately after all proposed amendments were offered and voted upon) on May 29, 1996, by a vote of 63–36. 55 House Journal at 1343–1344. [Plaintiffs' Ex. 29, pp. 24–25.] It was sent to the Senate which passed the House bill, without any changes on June 6, 1996. *See* Michigan Bill Tracking, available on WESTLAW, MI–BILLS Database. It was signed into law by the Governor on June 14, 1996, *id.*, to take effect March 31, 1997.[11]

## E. *ABORTION PROCEDURES*

In order to fully understand the witnesses' testimony and the parties' arguments regarding the constitutionality/unconstitutionality of the statute, an understanding of the various methods for performing abortions is necessary. The various abortion procedures were described by the witnesses who testified at trial.

### 1. Vacuum Aspiration (also referred to as "suction aspiration")/dilatation curettage (also referred to as "suction curettage").

In the first trimester of pregnancy, physicians generally perform abortions using the vacuum aspiration or the dilation and curettage ("D & C") method.[12] It is performed in an office setting by dilating the cervix at the time of the procedure either with mechanical dilators or over time using osmotic dilators, such as laminaria or dilapan. After the cervix is dilated, a plastic cannula is inserted into the uterine cavity and a source of suction is applied so that all the products of conception can be removed from the uterine cavity through the cannula.

---

**11.** Although as presented in the House, the law was to take effect on October 1, 1996, (*see*, P.A. 273 § 1, M.C.L.A. § 333.16221 Note, as reported in 1996 Michigan Legislative Service No. 4 at 699), the Michigan Constitution provides that a statute may not take effect "until the expiration of 90 days from the end of the session at which it was passed" unless the legislature votes by a two-thirds majority, to give the statute immediate effect. Mich. Const. art. 4, § 27. *See also* Op. Mich. Att'y Gen., No. 4856 (Dec. 13, 1974). The legislature's vote on immediate effect fell short of the two-thirds needed. 55 House Journal at 1345–1346. [Plaintiffs' Ex. 29. pp. 26–27.] Because the session ended on December 31, 1996, the Act took effect March 31, 1997.

**12.** Dr. Westoff also testified briefly concerning very early first trimester "medical" pregnancy terminations using either mifepristone (commonly known as RU–486) and methotrexate. These agents are used only up to 8 weeks Imp.

Dilatation curettage is a similar method that is used in the first trimester of pregnancy. It is a procedure where the cervix is dilated and then the contents of the uterine cavity are scraped using an instrument called a "curet" and then evacuated with suction. Both of these aspiration and curettage procedures can usually be successfully completed without any additional instrumentation until about 13 weeks gestation. Generally, after 12–13 weeks, the fetus becomes too large to remove by the use of suction curettage, although Dr. Giles testified that, in his experience, he has used suction without any additional instrumentation in some cases up to 15 weeks.

## 2. Dilatation (or dilation) and Evacuation ("D & E")

Generally speaking, the D & E procedure is the preferred method for second trimester abortions and, both nationally and in Michigan, accounts for approximately 85% of all second trimester abortions past 12 weeks.

This procedure is used from 13 weeks lmp and can be done throughout the entire second trimester, although it is not as frequently used after 20 weeks. In performing a D & E, the physician dilates the cervix and then surgically removes the fetus and other products of conception. In this procedure, the physician typically accomplishes the dilation of the cervix using osmotic dilators ("dilateria"), which are small tubes that absorb moisture and expand in the woman's cervix over several hours or overnight.

After the dilateria are inserted, the woman may experience some cramping which can be relieved with mild analgesics, but otherwise, she can go about her regular routine. Depending on the patient, her prior pregnancy/delivery history, and gestational age of the fetus, dilation generally takes five to six hours. In some cases, repeat applications of dilators are called for, and in those cases, the woman returns to the clinic after a few hours for the additional application. In some other cases, the dilateria are left in overnight and the woman returns the next day for the surgical procedure. The surgery is performed after the cervix is dilated.

Usually in a conventional D & E, the physician removes the dilateria from the cervix, then ruptures the membranes, and dismembers the fetus in the uterine cavity using sharp instruments such as forceps, and suction. He then removes the fetal parts by pulling them out piece by piece through the cervical os.

The surgical procedure itself is generally done in the clinic setting and takes approximately 40 minutes to complete. Plaintiffs', Defendants' and the Court's medical experts all testified that from 13–16 weeks lmp, D & E is essentially the only abortion method available because inductions—the next most frequently used second trimester abortion procedure—generally cannot be successfully accomplished.[13]

## 3. Intact D & E (also referred to as D & X)

The intact D & E, or D & X, procedure is a variation of the conventional D & E procedure in which the physician, rather than removing the fetus in parts, removes it from a breech position intact up to the head, and then, if necessary, reduces the size of the head (by collapsing the calvarium using forceps or by evacuating its contents using suction) to remove the intact fetus the rest of the way. The American College of Obstetricians and Gynecologists defines this procedure as including only those instances in which there is (1) a deliberate dilation of the cervix; (2) instrumental conversion of the fetus to a footling breech position; (3) breech extraction of the body of the fetus excepting the head; (4) and partial evacuation of the intracranial contents with suction. [January 12, 1997 *ACOG Statement of Policy on Intact Dilatation and Extraction,* Plaintiffs' Ex. 4.] [14]

---

**13.** Even Defendants' expert, Dr. Giles, testified that, although in some cases, he has been able to successfully use the first trimester suction curettage procedure (without the need to dismember the fetus with additional instrumentation) up to 15 weeks, during the 13–16 week period, induction is generally not feasible and for that period, D & E is his preferred procedure.

**14.** This is the definition which ACOG has adopted in attempting to describe a "partial birth abortion" procedure.

#### 4. Induction/Instillation

In Michigan and nationwide, induction abortions account for nearly all of the post-first trimester abortions that are not D & Es. This procedure is generally done only in hospitals. Induction abortion is a medical technique in which the physician essentially induces pre-term labor. There are several means used to induce labor which generally fall into two categories. The physician may introduce the labor-inducing agent—prostaglandins, saline or urea—using an intra-amniotic injection. Or, rather than intra-amniotic injection, using one of several forms of prostaglandin as the labor-inducing agent, the doctor may introduce the agent using an intramuscular injection or intravaginal suppository. Additionally, some physicians couple the use of the medical labor-inducing agent with the use of osmotic dilators.

As indicated above, using this method, labor is induced. Labor in an induction abortion can last anywhere from six to thirty-six hours, during which time, the woman experiences contractions, pain and other side-effects such as nausea, vomiting and diarrhea, and may, in fact, be bedridden.

Inductions are rarely attempted prior to sixteen weeks because prior to that time they are generally unsuccessful.[15] The experts gave several reasons for this. First, the uterus is less sensitive to the medications involved at that early stage of gestation and, therefore, the medications may not cause effective contractions. In addition, at the earlier stages of pregnancy this procedure may take up to three times as long as it normally takes after 16 weeks, and because the maternal tissue layer of the placenta is normally not sufficiently developed prior to 16 weeks, there is a much greater chance that the placenta will remain attached. Consequently, even if labor contractions are caused and the fetus passes, an invasive surgical procedure is still necessary to complete the abortion.

#### 5. Hysterotomy and Hysterectomy

Hysterotomy and hysterectomy are also used to terminate pregnancies, but very rarely. The two procedures combined account for far less than one percent of post-first-trimester abortions in Michigan and throughout the country. Hysterotomy is the transabdominal, surgical removal of the fetus from the uterus prior to term (i.e., a pre-term caesarean section). Hysterectomy entails the removal of the uterus. Both hysterotomy and hysterectomy are major surgical procedures which carry high risks of mortality and morbidity.

#### F. *RELATIVE SAFETY OF SECOND TRIMESTER ABORTION PROCEDURES*

#### 1. *Conventional D & E vs. Induction*

Drs. Evans, Westoff, Johnson, Giles and Cook all testified that the D & E procedure is a safe procedure and that, as compared to induction, the two procedures are of comparable safety through the 18th week of pregnancy. Further, according to the American College of Obstetricians and Gynecologists, in the early second trimester, between weeks 13 and 15 of pregnancy, D & E is the safest abortion procedure available, with the lowest rate of maternal mortality, fever, hemorrhage and cervical injury. [*ACOG Technical Bulletin* No. 109, October 1997, p. 3, Plaintiffs' Ex. 3. *See also,* Testimony of Dr. Johnson, 5/6/97, p. 180 ("I think that at 14, 15, 16 weeks, dilatation and evacuation is probably a safer and easier procedure than instillation [induction], which generally is not done at that time. The earlier in gestation, probably the more relative safety is associated with a D & E.")]

---

**15.** Only Dr. Cook disputed the other doctors' testimony that induction is not a viable method in the 13 to 16 week period. Dr. Cook opined that intravaginal intramuscular induction can be used at 14 to 16 weeks. However, given Dr. Cook's testimony regarding his limited experience performing abortions of any type—that he has never performed a first trimester abortion, and with respect to second trimester abortions, he has never performed a D & E and has performed at most "less than a dozen" inductions—the Court is not persuaded by Dr. Cook's testimony regarding the feasibility of effective inductions prior to 16 weeks. Defendants' other expert, Dr. Giles, testified that inductions cannot be successfully performed before 16 weeks. The Court-appointed expert, Dr. Johnson, also testified to this, as did all of Plaintiffs' medical experts.

D & Es are associated with a number of potential complications, including uterine perforation, infection, retained products of conception, and tearing of the cervix, but as Drs. Christensen, Johnson, Westoff and Giles testified, these complications are very rare. Dr. Doe testified that a previous caesarean section or previous myomectomy are also complicating factors that can make a D & E difficult in the first half of the second trimester.

The only evidence of contraindications for D & Es was Dr. Doe's testimony that a D & E would be contraindicated for woman with large fibroids in the uterus. Other than that single situation, all of the doctors who testified on this issue are in agreement that there are no absolute contraindications for D & Es. However, the skill level and experience of the physician is an important safety factor. As Dr. Westoff explained, "Doing any kind of D & E procedure does require technical expertise; and if someone is not trained to doing that, that clinician's patient will be safer with an induction procedure . . . ." [Westoff 5/1/97 dep., p. 67.]

With respect to inductions, the doctors who testified are in agreement that inductions have safety rates comparable to D & Es from 16 to 18 weeks.[16]

Because they do not require the use of instrumentation in the uterus, inductions require less skill on the doctor's part and present less risk of uterine perforation than do D & Es. However, as Dr. Westoff explained, inductions have higher rates of infection, bleeding, cervical lacerations, amniotic fluid embolus and disseminated intravascular coagulation ("DIC"). [See also, ACOG Technical Bulletin, No. 109, October 1997, p. 3, Plaintiffs' Ex. 3.]

Drs. Johnson, Evans and Westoff testified that inductions are absolutely contraindicated for a woman with a prior classical caesarean scar or prior hysterotomy because of the risk that contractions will cause a fatal uterine rupture.[17]

Drs. Johnson, Evans and Westoff are also in agreement that inductions are relatively contraindicated for patients with renal or cardiovascular disease, among other conditions. In these cases, the stress of labor can aggravate the underlying diseases. They also agree that inductions are relatively contraindicated if the fetus has a condition such as severe hydrocephaly which can increase the risk of a vaginal delivery.

Dr. Johnson and Dr. Giles also testified that specific induction procedures have their own contraindications. Prostaglandins pose particular risks to women with heart disease, diabetes, and asthma. Dr. Giles also testified that renal disease and serious heart conditions contraindicate saline instillation. Dr. Johnson stated that urea is contraindicated in women with renal failure.

With respect to the relative safety of particular induction procedures, although Dr. Giles testified that his preferred induction

---

16. Drs. Cook and Giles opined that after 18 weeks, inductions are safer as compared to D & Es. [See also, Testimony of Dr. Johnson, 5/6/97. supra, p. 180.] This opinion is supported by epidemiological data. See, 5/7/97 transcript. p. 297 (fatality rates for induced abortion through instillation after 21 weeks was 10.3 and for D & E the rate was 11.9). Hershel W. Lawson, et al., Abortion Mortality, United States, 1972 through 1987, 171 Am. J. Obstet. Gynecol. 1365, 1368, Table III [(November 1994)]

17. Dr. Giles and Dr. Cook opined otherwise. Dr. Giles stated that while at term, he would be concerned that a classical caesarean section scar might cause uterine rupture, in his opinion, the risk of uterine rupture in the second trimester would be very small. However, he admitted that this was simply his own personal opinion, not the accepted view of the medical community as a whole. ("In fairness, however, I'm one perinatologist, and there are perinatologists out there who feel very strongly that a classical cesarean section is a direct contraindication to an induction method." [Giles Testimony, 5/7/97, p. 115.]) Dr. Cook also stated that he did not believe that induction would be absolutely contraindicated because of a classical c-section, but admitted that a c-section would present an increased risk for induction for the patient, but no greater risk than the risk of uterine perforation in a D & E procedure. However, as noted above, given Dr. Cook's limited experience with abortion—having testified to never performing a D & E and having done no more than a dozen inductions—his opinion and comparison of the risk of a classical caesarean section in an induction to the risk of uterine perforation in a D & E is clearly outweighed by the otherwise uniform evidence to the contrary presented by the doctors who have great familiarity with both procedures.

abortion procedure is saline instillation. Drs. Johnson and Westoff testified that saline instillation is generally no longer used as a medical induction procedure in this country because it is significantly less safe than other induction agents.[18] Consequently, saline instillation is no longer used at the University of Michigan Medical Center as a method of induction. Dr. Johnson further testified that as between saline inductions and conventional D & Es, saline inductions pose a greater risk of hyper osmolar crisis, cardiac failure, septic shock, peritonitis, hemorrhage and water intoxication. However, Dr. Giles and Dr. Johnson were in agreement that the type of induction agent is a matter best decided on a case-by-case basis, based upon the physician's assessment of the patient and her medical history.

In terms of reported complications, in Michigan in 1995, there were only two reported complications out of 3,094 D & E abortions. [*Induced Abortions in Michigan 1995*, p. 19, Table 10; p. 24, Table 15: p. 25, Table 16, Plaintiffs' Ex. 8.] The rate of reported complications in the state for induction abortions was 3 out of 61, or 4.92 per 100 abortions. *Id.* at p. 25, Table 16.

As Drs. Evans, Westoff and Johnson testified, where induction is contraindicated, D & E is the preferred, if not the only, safe method of abortion.

### 2. *Conventional D & E vs. Intact D & E*

Comparing a conventional D & E to an intact D & E, Drs. Westoff, Doe, Evans, Christensen, Johnson and Cook all agree that intact procedures reduce risks associated with conventional D & Es. The intact procedure reduces the risk of uterine perforation and cervical lacerations because, removing the fetus intact, rather than in pieces, entails less instrumentation of the uterus and minimizes the passage of bony fetal fragments through the cervix and vagina. Removing the fetus intact also reduces the risk of a free-floating head, an uncommon, but signifi-

cant complication of a conventional D & E. And, as Dr. Westoff testified, removing the fetus intact is often quicker than dismembering it, the woman has less operative time, which means less risk of hemorrhage, less total bleeding and less risk of infection.

Further, as Dr. Evans opined, the intact procedure would be superior to a conventional dismemberment procedure for a woman for whom induction is contraindicated and who has a presumed fetal abnormality for which a fetal autopsy would be very instructive.

### 3. *D & Es vs. Hysterotomy and Hysterectomy*

Hysterectomy and hysterotomy are major surgical procedures and carry higher risks of mortality and morbidity than both D & Es and inductions. The only evidence to the contrary—Dr. Cook's testimony that a D & E is riskier than a hysterotomy after 20 weeks—is not borne out by epidemiological studies which show that the mortality rate for D & E after 20 weeks is 11.9 per 100,000, while the mortality rate for a hysterotomy after 20 weeks is 274 per 100,000. *See, e.g.*, Hershel W. Lawson, et al., *Abortion Mortality, United States, 1972 through 1987*, 171 Am. J. Obstet. Gynecol. 1365, 1368, Table III (November 1994).

The damage to the uterus from a hysterotomy is permanent. Dr. Evans testified that a woman who has had a previous hysterotomy runs a 15–20% risk of uterine rupture if she tries to labor and deliver vaginally. If the rupture occurs, there is a 50% chance that the baby would die. There is also a significant risk of death for the woman, especially because the scar might rupture even before the onset of any recognizable labor, when she would not yet be in a hospital.

Because of the risk of uterine rupture, a woman who has had a hysterotomy must deliver any future children by caesarean section, a procedure carrying significantly high-

---

**18.** Dr. Giles testified that the reason that he prefers using saline, particularly for later second trimester abortions, is that he believes that "invariably the fetal heart will stop a short period of time after the injection". [Dr. Giles 5/7/97 Testi-

mony. p. 173.] However, Dr. Johnson testified that performing a saline instillation cannot guarantee the absence of a heartbeat. [Dr. Johnson 5/7/97 Testimony. p. 289.]

er risks of maternal morbidity and mortality than vaginal delivery.

## G. AVAILABILITY OF SECOND TRI-MESTER ABORTIONS IN MICHI-GAN

Nearly all D & Es in Michigan are performed in non-hospital facilities. Dr. Henshaw testified that only 12 hospitals in Michigan provide abortions after the first trimester. Most of these hospitals are in the Detroit metropolitan area. Dr. Henshaw also testified that most hospitals in Michigan that provide abortions after the first trimester do not allow a woman to self-refer for an abortion. To obtain an abortion at a hospital, the woman must make arrangements with a physician with privileges at the particular institution.

By contrast, all inductions in Michigan are performed in hospitals or hospital-like facilities. Because they are performed in hospitals or hospital-like settings, inductions are more expensive than D & Es performed in outpatient facilities.

With respect to the cost of abortions, the cost of a D & E increases as pregnancy advances. Comparing costs of D & Es and inductions, the cost of a D & E does not approach the cost of a hospital induction until 22 to 24 weeks. Hysterotomy and hysterectomy, because they require hospitalization, are far more expensive than D & Es and inductions.

## H. TESTIMONY REGARDING THE MICHIGAN STATUTE

As set forth above, the Michigan "partial birth abortion" statute makes it a crime for a physician to perform a "partial birth abortion" except when "necessary to save the life of pregnant woman whose life is endangered by a physical disorder, physical illness, or physical injury and no other medical procedure will accomplish that purpose".

"Partial birth abortion" is defined in the statute as "an abortion in which the physician ... partially vaginally delivers a living fetus before killing the fetus and completing the delivery." The statute's prohibition against "partial birth abortions" is not limited to post-viability, or "late term" abortions.

At trial, Drs. Evans, Christensen, Johnson, Giles and Cook were specifically asked for their understanding of the statute.

There appears to be agreement among all of the doctors who testified that the term "partial birth abortion" is not a medical term; it is not a part of any standard accepted medical lexicon and is not a term found in the medical literature. The doctors were also unanimous in their understanding of the meaning of the term "living" as used in the statute's definition of a "partial birth abortion": A living fetus means a fetus having a heartbeat. The doctors also are in agreement that a heartbeat is discernable by 5 to 7 weeks of pregnancy. Further, the doctors agree that a "living fetus" does not mean a "viable" fetus. To be viable means being capable of surviving outside the uterus, albeit with medical assistance.[19]

However, the doctors differed widely as to what procedures they thought the statute prohibits. Some of the doctors thought the Act could reach conventional D & Es, intact D & Es and some inductions. Dr. Evans thought it could reach even suction procedures. Another doctor, Dr. Cook, thought it reached only intact D & Es where the head was extracted after the skull was either crushed with forceps or its contents evacuated with suction.

Dr. Evans testified that he understands "partially vaginally deliver[ing] a living fetus" as used in the statute's definition as meaning "when part of the fetus has been delivered through the cervix and part of it is still inside [the uterus]." [5/5/97 Tr. pp. 140–141.] With respect to the term "delivers" as used in the statute, Dr. Evans testified that obstetricians and gynecologists do not merely use that term to mean "delivering a full fetus or

---

**19.** "Viability" does not mean ultimate "survivability". As the court noted in *Women's Medical Professional Corp. v. Voinovich*, 911 F.Supp. 1051 (S.D.Ohio 1995), babies with certain chromosomal defects are considered viable "even though these children have no reasonable chance for normal mental [or] motor development ... even though it's a very serious defect [and] even though it usually leads to death in the nursery [soon after birth]." *Id.* at 1091 n. 42.

a full baby ": "[A]nything you bring out of the uterus, we *deliver* out of the uterus." *Id.* at 141 (emphasis added).

Dr. Evans testified that, in his mind, the term "partial birth abortion", is vague and ambiguous because as it is defined in the statute, it does not merely refer to a single, discrete medical procedure, but rather, it can be read to cover essentially all abortion procedures used, except hysterotomy and hysterectomy. Therefore, he stated that he cannot know what procedure or procedures are banned.

Dr. Evans explained why he believes the statute's definition of "partial birth abortion" can be read to cover conventional D & Es:

> [W]hen I'm intending to do a routine D & E, as I said, I will grasp up to reach part of the fetus and I will pull the fetus down. Very commonly, for example, if I get a leg, part of that leg will protrude into the vaginal cavity, then be disarticulated and the hemorrhaging then causes the death of the fetus. So even a routine D & E would fall under this category, as I interpret it.

[Dr. Evans Testimony, 5/7/97 pp. 137–138.] [20]

He further explained why he believes the statute could be interpreted as also banning inductions, which, because of the size of the fetal head, by necessity have to become D & Es:

> [I]f I were doing an induction and the fetus was delivered breech.... And ... the fetal head is trapped, which is essentially analogous to what we said with the D & E before....

... The head is by far and away the biggest part of the fetus at that stage of pregnancy. So it is very reasonable and common for the body to deliver up the level of the head and at that point, the dilatation is not sufficient for the head to pass.... And you either then have a choice of decompressing the head to make the head smaller or continuing with the labor process until the dilation is sufficient for the head to pass out intact. And that may take a short period of time or it may take a long period of time.

*Id.* at 149–50.

Dr. Evans explained that there are instances where it would be riskier, when the fetal head is stuck, to make the woman continue with a prolonged period of labor, such as when the patient has an infection or a patient who, despite having had a previous cesarean section, really wanted to have an induction abortion as opposed to a D & E, but six hours more of labor would seriously increase the risk of uterine rupture. *Id.* at 150. He believes, however, under his interpretation of the statute, that if he were to then reduce the calvarium to complete the abortion, he could be prosecuted for violating the statute.

Similarly, Dr. Evans, (who testified that he has never intentionally performed an "intact D & E") testified that when he sets out to perform a conventional D & E, that procedure sometimes develops into an intact D & E:

> I do not go into the operating room intending to perform intact dilation and extrac-

---

**20.** Dr. Evans further reads the statute as covering even first trimester suction and aspiration abortions, explaining,

> If you're doing a suction abortion in the first five or six weeks, the fetus [suctioned into] the suction cannula is coming out through the vagina, and part of the fetus will come out before all of the fetus.
>
> ... [B]ecause you are delivering that fetus, that embryo, through the cervix into the vaginal canal, as I understand the statute to read, I would be fearful that in fact even that would fall under the statute.... If I have delivered part of [the fetus] or disarticulated part of it while the heartbeat was still inside, I believe that would fall under the statute.

[5/5/97 Tr. pp. 104–105; 141–142.]

The Court does not adopt this view. Dr. Evans' view on this point was not shared by any other physician and seemed to the Court to be a product of his own advocacy and not sound medical judgment. Moreover, Dr. Johnson disputed Dr. Evans view. "I don't think [the statute could be read to include the suction technique.] I think that the first trimester suction technique, when the suction curet is placed inside the uterus and the fetal contents removed, [removal] happens so quickly that I can't imagine ... how you could partially [vaginally deliver the fetal contents].... [Y]ou would have to have somebody in there with a machine seeing what part is actually coming out first before you actually did the killing. So, it's hard for me to imagine how [the] statute would extend to [first trimester suction]." [5/7/97 Tr. pp. 295–96.]

tion procedures but there have been times when I have gone into the operating room with the intent to perform a regular D & E where I have done what could be construed to be an intact D & E.... We may have tried to bring the fetus out and then the head gets stuck, I may have reduced the calvarium.

And I have done that both in the operating room, while intending to do a D & E, and for patients who we have been inducing....

*Id.* at 191.

Thus, he explained that, even if the statute is deemed to cover only "intact D & Es" (as argued by Defendants), as he reads the statute, he would be subject to prosecution under the Act because the statute does not proscribe only *intentionally* performing an intact D & E:

> [I]f the law were interpreted as only prohibiting ... the deliberate intent, before you started the procedure, of ... dilating [with] the intention of extracting the whole fetus and then crushing the head, then I would know what would be prohibited. And if I were assured by the court that nothing else other than that would be criminally culpable, okay, then I think we'd be on safer ground than we are now.

*Id.* at 192.

Dr. Christensen also testified that as he interprets the statute, the procedures that he performs, which are exclusively conventional D & Es, could be viewed as being in violation of the Act. He explained:

> [T]he language of the definition [in the statute] is so broad [as] to basically include any abortion procedure where the fetus is partially removed into the vagina. And that is what I do when we do the D & E procedures.
>
> \*   \*   \*   \*   \*   \*
>
> [I]n the course of removing the fetus [in a conventional D & E], it usually does not come out intact, so I would consider, you know, when we fragment the fetus, we are

partially removing it at some stage during the procedure.

[5/6/97 Tr. p. 14–17.]

He explained that he believes that "partially vaginally deliver" under the statute can be read to mean "[e]ither part of the fetus has been removed or the whole fetus has been partially removed. I think you can interpret it both ways."

With respect to the "killing" portion of the statute's definition (i.e., "partially vaginally delivers a living fetus before *killing* the fetus"), Dr. Christensen testified that "[his] reading of the statute is that anything you do that terminates the signs of life of the fetus when it's partially out of the woman violates the statute." *Id.* at 66. He went on to explain that he did not read the statute as requiring a separate "killing" step after "partially removing" the fetus: "My interpretation of the statute is [that] in partially removing [the fetus] you have done that [i.e., killed the fetus]. ....I don't read [the statute] as necessarily defining two steps. I read it as having two things happen, not necessarily separate.... [O]nce I have partially removed the fetus from the uterus, that is an act that I have committed that has killed the fetus." *Id.* at 66–68.[21]

The Court's expert, Dr. Johnson, also testified that the statute's definition of partial birth abortion "is not entirely clear to me as a physician in terms of what it means." [5/6/97 Tr. p. 194.] He explained his confusion:

> [T]he part that's problematic for me is the part that reads "partially vaginally delivers a living fetus before killing the fetus." That phrase to me, it's not entirely clear to me what that phrase means, whether it encompasses what has been described by the American College of Ob–Gyn as intact dilatation and extractions or whether that includes what has generally been called traditional D & Es. And the reason that I have problems with it ... has to do with "partially vaginally delivers."
>
> When we talk about a delivery in medicine, we use the term "delivery" fairly

---

**21.** The Court does not agree with, nor does it adopt, Dr. Christensen's interpretation of the statute on this point as it seems to ignore the plain statutory language that indicates the fetus must be "partially vaginally deliver[ed] *before*" it is killed.

broadly. So that I would, in my practice, say "I delivered the baby." But we would also say "I delivered the ovary into the incision" or "I delivered the uterus into the womb." And so that "delivery", at least as I think of it, doesn't necessarily mean delivery of an intact, whole fetus.

And so the concern I have is whether or not this terminology includes traditional D & Es or whether it only includes what has been described as intact dilatation and extractions....

[So], it's fair to say that I personally don't right now know exactly what acts are considered under that [statutory definition].

[5/6/97 Tr. pp. 194–195 (some quotation marks added)].

Explaining why he was not clear whether the statute covered only intact D & Es, or conventional, fragmented D & Es, as well, Dr. Johnson said:

[I]f you start off with a living fetus and then you partially deliver that fetus, as nearly as I understand the English language, that means you deliver a part of that fetus. So, that means you could deliver a part of it intact or a part of it not intact, at least as I understand the English language and the use of adverbs like this.... So, I think that "partially" describes the delivery process. And I don't see anywhere here—it starts off with a living fetus and I start delivering that fetus. And from a medical point of view, that could mean either intact, that could mean parts of it, at least the way I read the law.

*Id.* at 219.

Dr. Johnson further testified that even if the statute was narrowed by a court to include only intact D & Es, he read nothing in the Act that told him that to violate the statute, a doctor has to actually intend to perform an intact D & E as opposed to unintentionally performing an intact D & E: "As I see it, if one does the [intact] procedure, then one is violating the statute", regardless of whether or not the physician ever intended to do so. *Id.* at 197.

Defendants' expert, Dr. Giles, conceded that some doctors could interpret the phrase "partially vaginally deliver" in the statute's definition to cover the evacuation of a dismembered portion of the fetus, as done in a conventional D & E. [5/7/97 Tr. p. 169.] However, he testified that that was not the way he read the definition; he read "partially vaginally deliver" to mean the partial removal of an intact fetus. *Id.* He admitted, however, that the reason he understood "partially vaginally deliver" to mean a partial removal of an intact fetus was based principally on what he knew about the Ohio partial birth abortion statute and his participation as a witness in a lawsuit challenging that statute. *Id.*[22]

Dr. Giles testified that he believed that the Michigan statute prohibited only a vaginal delivery of an intact fetus with the intent of killing the fetus before delivery is completed. [5/7/97 Tr. pp. 162–163.] Therefore, he opined that where a doctor is performing a conventional D & E and manages to pull the fetus out intact up to the head, compressing the skull with forceps, with the knowledge that the compression might kill the fetus, would not be violating the statute because "the intent to kill the fetus would not be there". *Id.* "However, when the Court asked Dr. Giles to review the statute and the doctor found no intent to kill" requirement, he admitted, that he could understand how some doctors might interpret the statute as covering the conventional D & E scenario discussed above:

A [by Dr. Giles]: I can understand how some might interpret [the statute] that way. From my standpoint, using forceps to deliver the fetal head is not synonymous with killing the fetus....

THE COURT: If the fetus is killed in doing that, as you testified could well happen, would you not violate the statute?

A: Inadvertently, you might.

*Id.* at 163.

Dr. Cook also testified that he read the statute as covering only the intentional kill-

---

**22.** *Women's Medical Professional Corp., v. Voinovich,* 911 F.Supp. 1051 (S.D.Ohio 1995). Dr. Giles testified as a witness in that case which involved the Ohio partial birth abortion statute, the language of which is substantially different from that of the Michigan statute.

ing of a partially delivered intact fetus and, therefore, he did not understand the statute to also cover conventional D & Es where the fetus is delivered dismembered. [5/7/97 Tr. p. 251.] However, he admitted that some physicians could read the statute to cover conventional D & Es:

A [by Dr. Cook]: ... I read being "partially vaginally delivered" as meaning [delivering] part of the intact and whole fetus....

THE COURT: ... Would your opinion change or be affected if I told you that the legislature defeated a number of amendments which would have included the word "intact" or which would have conveyed the idea that the statute was triggered only when the fetus was intact?

A: I guess I would answer no, because I read this as meaning the fetus intact. When they say "partially vaginally delivers a living fetus", to me that means an intact fetus....

THE COURT: Do you believe that some physicians could read it that way, however?

A: I suppose they could. That was not my reading of it, but I suppose it's possible.

*Id.* at 250–51.

The doctors also testified regarding possible means to avoid prosecution under the statute by insuring fetal demise before beginning an abortion. The evidence at trial established that physicians can, and sometimes do, attempt to cause fetal demise before beginning an abortion procedure. However, in Dr. Johnson's opinion, to require a physician in order to comply with the law to have to do "an additional procedure to insure that the fetus is dead ... has potential risks to the mother, whatever those risks are, however small they are, from a medical point of view ... is unacceptable." [5/7/97 Tr. p. 210.]

The most common method of attempting to ensure fetal demise is to attempt a transabdominal injection of an agent such as potassium chloride or digoxin into the fetus or amniotic cavity. [5/6/97 Tr., pp. 186–87 (Testimony of Dr. Johnson). *See also,* pp. 42–43 (Testimony of Dr. Christensen) and 5/7/97 Tr. p. 194 (Testimony of Dr. Giles).] Howev-

er, any effort to inject potassium chloride or digoxin or another agent into the amniotic cavity or fetus presents a risk of amniocentesis, hemorrhage, infection, or uterine necroses. [5/6/97 Tr. p. 43 (Dr. Christensen); and p. 187 (Dr. Johnson). *See also,* 5/5/97 Tr. p. 167 (Testimony of Dr. Evans).] Moreover, many physicians do not have the appropriate skills to perform fetal injections. [5/6/97 Tr. p. 187 (Dr. Johnson).] Furthermore, it may be impossible to inject the fetus in some circumstances, such as where the patient is obese, or has fibroids blocking the anterior wall of the uterus [5/5/97 Tr. p. 84 (Testimony of Dr. Doe); 5/6/97 Tr. pp. 189–90 (Testimony of Dr. Johnson).] Similarly, attempting to inject the umbilical cord transabdominally in order to ensure fetal demise, requires skill that only a very small percentage of physicians have. [5/5/97 Tr. p. 18 (Testimony of Dr. Evans).]

Fetal demise could also be attempted by transcervical injection of a toxic agent. However, as Dr. Johnson testified, that probably would be less effective than other techniques. Dr. Johnson further explained that one of the problems with a transcervical injection is once the membranes are ruptured, the amniotic fluid is gone. Therefore, instilling urea or anything else would not necessarily insure that the fetus were dead, and that might have significant maternal side effects.

The doctors also were questioned about ensuring fetal demise by cutting the umbilical cord before beginning an abortion procedure. However, as Dr. Westoff testified, the cord is often nowhere near the cervix as one begins a D & E and it is not possible to reach it at the time the procedure is be initiated. Dr. Evans further testified that, if the fetus is still in the uterus and the doctor pulls the cord down and then cuts it, the doctor might be in violation of the statute because at that point the umbilical cord is part of the fetus. [Evans Testimony, 5/5/97 Tr. p. 168; *See also* Testimony of Dr. Cook, 5/7/97 Tr. p. 250].

## IV. CONCLUSIONS OF LAW

### A. STANDING

Before beginning its constitutional analysis of the Michigan "partial birth abortion" law,

the Court will briefly address Defendants' contention that the Plaintiffs lack standing to challenge the statute on undue burden grounds. Defendants do not dispute that Plaintiffs have standing to raise their vagueness challenge because there is no dispute that as providers of abortions, Plaintiffs are subject to prosecution under the statute. The Supreme Court has made clear that when prosecution seems apparent, a litigant need not first expose himself to actual arrest or prosecution to be entitled to challenge the constitutionality of a statute. *See, Steffel v. Thompson,* 415 U.S. 452, 457–59, 94 S.Ct. 1209, 1215, 39 L.Ed.2d 505 (1974). The Court further stated in *Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) that when a plaintiff "has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he 'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.' " *Id.* at 298, 99 S.Ct. at 2308, quoting *Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973).

■ Defendants do, however, contest Plaintiffs' standing to bring an undue burden challenge to the statute. Defendants claim that only women seeking abortions covered by the statute have standing to assert an overbreadth/undue burden attack on the statute. The Court finds no merit in Defendants' argument. Both the Supreme Court and the Sixth Circuit have explicitly held that doctors who perform abortions are entitled to third-party standing to assert the rights of women seeking abortions.

The Sixth Circuit explained the standards applicable to third-party standing in this context in *Planned Parenthood Ass'n v. City of Cincinnati,* 822 F.2d 1390 (6th Cir.1987):

> One of the standards relevant to [the standing inquiry] is the well-established principle that a plaintiff "generally must assert his own legal rights and interests and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth [v. Seldin],* 422 U.S. [490], 499, 95 S.Ct. [2197], 2205 [45 L.Ed.2d 343 (1975) ].

> There are exceptions to this rule, however, under which litigants have been permitted to assert the rights of third parties. There are essentially two types of cases involving *jus tertii* standing. The first is where the litigants challenge statutes which regulate their activity and, as a result, violate the rights of third parties. Plaintiffs in this type of case have uniformly been permitted to assert the rights of the affected third parties. See *Craig v. Boren,* 429 U.S. 190, 194–97, 97 S.Ct. 451, 455–57, 50 L.Ed.2d 397 (1976); *Eisenstadt v. Baird,* 405 U.S. 438, 443–46, 92 S.Ct. 1029, 1033–35, 31 L.Ed.2d 349 (1972). The second genre of *jus tertii* cases involve litigants seeking to assert solely the rights of third parties as being impinged by a statute. *Jus tertii* standing in this type of case is more difficult to establish, and generally depends on two factual elements. The first is whether the litigant's relationship with the third party whose right he seeks to assert is such that "the enjoyment of the right is inextricably bound up with the activity the litigant wishes to pursue." *Singleton [v. Wulff],* 428 U.S. [106], 114, 96 S.Ct. [2868], 2874 [49 L.Ed.2d 826 (1976) ]. The second is whether the third party is not able to assert the affected right on his own behalf. *Id.* at 115–16, 96 S.Ct. at 2874–75.

822 F.2d at 1394. *See also, Volunteer Medical Clinic, Inc. v. Operation Rescue,* 948 F.2d 218, 222–23 (6th Cir.1991).

*Volunteer Medical Clinic* and *Planned Parenthood,* as well as the cases cited in the above-quoted excerpt from that case, all deal with statutes and ordinances regulating abortion and contraceptives, and the potential prosecution of doctors, hospitals and abortion clinics under those statutes. In these cases, the Supreme Court and the Sixth Circuit have uniformly held that doctors have standing "to assert the rights of women patients as against governmental interference with the abortion decision." *Singleton v. Wulff, supra. Accord Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 745–46, 35 L.Ed.2d 201 (1973). This is precisely the situation presented in this case—we have a statute regulating abortion under which doctors and

abortion clinics face potential prosecution. Therefore, just as the courts found with respect to the plaintiffs in *Planned Parenthood v. City of Cincinnati* and *Volunteer Medical Clinic v. Operation Rescue,* Plaintiffs in this case have standing "to assert the rights of women patients as against governmental interference with the abortion decision" and, therefore, have standing to mount their challenge on overbreadth/undue burden grounds as well as on vagueness grounds.

## B. CONSTITUTIONALITY OF THE STATUTE

■ Turning to the question of constitutionality of the Michigan "partial birth abortion" statute, the Court begins its constitutional analysis of the statute with several bedrock principles of jurisprudence. First, as a constitutionally inferior court, a federal district court is compelled to follow controlling Supreme Court precedent unless and until the Supreme Court itself determines to overrule it. *Hutto v. Davis,* 454 U.S. 370, 375, 102 S.Ct. 703, 705–06, 70 L.Ed.2d 556 (1982); *Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.,* 460 U.S. 533, 535, 103 S.Ct. 1343, 1344, 75 L.Ed.2d 260 (1983). Justice Rehnquist emphasized the importance of precedent in *Davis, supra,* when he observed that "unless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by lower federal courts no matter how misguided the judges of those courts may think it to be." 454 U.S. at 375, 102 S.Ct. at 706. Thus, a federal district or circuit court "may not reject, dismiss, disregard or deny Supreme Court precedent until the Supreme Court itself determines to overrule it." *Hopwood v. State of Texas,* 84 F.3d 720, 722 (5th Cir.1996) (Politz, J. dissenting).

■ Second, state statutes enjoy a presumption of constitutionality. *See, McDonald v. Board of Election Commissioners,* 394 U.S. 802, 809, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739 (1969); *Hartford Fire Ins. v. Lawrence Dykes, Goodenberger, Bower & Clancy,* 740 F.2d 1362, 1366 (6th Cir.1984); *City of Ann Arbor v. Northwest Park Construction Corp.,* 280 F.2d 212, 223 (6th Cir. 1960). *See also, Rohan v. Detroit Racing Ass'n,* 314 Mich. 326, 341–42, 22 N.W.2d 433 (1946). Thus, when reviewing a state statute, a court should construe the statute to avoid constitutional difficulty, and give deference to the statute whenever possible. *Id.*

At the same time, a federal court must always be aware of the federalism concerns that arise whenever it deals with state statutes. *Eubanks v. Wilkinson,* 937 F.2d 1118, 1125 (6th Cir.1991) Guided by the principles of federalism, the Supreme Court has declared that federal courts lack the authority and power to give a limiting, narrowing construction to a state statute to remedy constitutional defects. *See Hynes v. Mayor of Oradell,* 425 U.S. 610, 622, 96 S.Ct. 1755, 1761–62, 48 L.Ed.2d 243 (1976). The Sixth Circuit has adhered to this principle. *See Eubanks v. Wilkinson, supra,* 937 F.2d at 1125–26. Thus, a district court may not, in order to find a state statute constitutional, "add to, delete from, [or] define the statutory language." *Id.* at 1126, quoting *Record Revolution No. 6. Inc. v. City of Parma,* 638 F.2d 916, 926 (6th Cir.1980), *vacated on other grounds,* 456 U.S. 968, 102 S.Ct. 2227, 72 L.Ed.2d 840 (1982). Rather, "a federal court must take the state statute or ordinance as written and cannot find the statute or ordinance constitutional on the basis of a limiting construction supplied by it . . . ." *Id.*[23]

---

**23.** In *Eubanks,* the district court found that substantial portions of a Kentucky parental consent statute unduly burdened a woman's right to an abortion. However, in an attempt to avoid declaring the entire statute unconstitutional and invalid, the court severed the portions of the statute which carried out the statute's dominant purpose (pursuant to a specific severability provision in the statute) and enjoined the operation of those portions, but left intact a secondary provision that was capable of independent operation, adding to that one secondary provision limiting

language, thereby modifying the statute so as to avoid unconstitutionality. *Id.* at 1120.

Applying the general rule that a federal court may not supply new limiting language for a state statute to create constitutionality, the Sixth Circuit determined that the district court erred in drafting a new limiting condition rather than striking the one retained portion of the statute as unconstitutional as it did with the other parts of the statute. *Id.* Thus, a federal court must interpret state statutes on their face and only construe

Finally, as this Court has previously observed,[24] federal courts should exercise great restraint in enjoining state laws and should not substitute their own judicial policy preferences for those of elected policymakers. It is only when a statute is clearly unconstitutional and/or violates clear controlling judicial precedent that a court should step in and enjoin the state law.

Guided by the foregoing principles, the Court turns to the legal issues presented in this case.

### 1. VAGUENESS

As indicated above, Plaintiffs argue that the Michigan "partial birth abortion" statute is unconstitutionally vague. They contend that the statute does not provide physicians with adequate clear notice of the specific procedure or procedures proscribed by the law because it is subject to multiple and confusing interpretations and can be read to encompass a number of abortion procedures, including well-established procedures that are commonly used and accepted in the medical community. They further argue that the Act's ambiguity is compounded by the absence of any intent requirement.

Because of its vagueness, Plaintiffs contend that the statute will have a profound chilling effect on the willingness of physicians to perform abortions after the first trimester.

Defendants counter that the Act simply prohibits only one particular method of abortion and is not so vague that it can be read to include other, permissible methods of abortion. Defendants further dispute Plaintiffs' contention that the statute lacks an intent requirement and argue that the Act does contain an intent requirement by implication and by reference.

■ The due process clauses of the Fifth and Fourteenth Amendments require that laws provide persons subject to regulation under them "a reasonable opportunity to know what [conduct] is prohibited, so that [they] may act accordingly." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972): *Day-*

ton Area Visually Impaired Persons, Inc. v. Lee Fisher, 70 F.3d 1474, 1476 (6th Cir.1995); Women's Medical Professional Corp. v. Voinovich, 911 F.Supp. 1051, 1063 (S.D.Ohio 1995). Stated otherwise, due process demands that a statutory prohibition be sufficiently defined "to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute," *Colautti v. Franklin,* 439 U.S. 379, 390, 99 S.Ct. 675, 683, 58 L.Ed.2d 596 (1979); *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983); *United States v. Avant,* 907 F.2d 623, 625 (6th Cir.1990). Thus,

> [A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.

*Smith v. Goguen,* 415 U.S. 566, 573 n. 8, 94 S.Ct. 1242, 1247 n. 8, 39 L.Ed.2d 605 (1974), quoting *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127–28, 70 L.Ed. 322 (1926).

■ A statute may also be vague if it is subject to arbitrary and discriminatory enforcement, due to a failure to provide explicit standards for those who apply the law. *Grayned v. City of Rockford, supra.* As the *Grayned* Court explained, a law that fails to provide explicit standards for those who apply them, is void for vagueness because it "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis with the attendant dangers of arbitrary and discriminatory application." *Id.* 408 U.S. at 108, 92 S.Ct. at 2299. *See also, Kolender v. Lawson, supra,* 461 U.S. at 358, 103 S.Ct. at 1858; *Smith v. Goguen, supra,* 415 U.S. at 574, 574–78, 94 S.Ct. at 1247, 1248–49 (due process is violated where a statute provides no definite standard of conduct, thereby giving law enforcement officers, courts and jurors unfettered freedom to act on nothing but their own preferences and beliefs.)

them within the bounds of what is a fair reading. *Id.* at 1126.

**24.** *See e.g., Kevorkian v. Thompson,* 947 F.Supp. 1152 (E.D.Mich.1997).

Moreover, where "a statute imposes criminal penalties, the standard of certainty [that due process requires] is higher." *Kolender v. Lawson, supra,* 461 U.S. at 358 n. 8, 103 S.Ct. at 1859 n. 8; *Springfield Armory, Inc. v. City of Columbus,* 29 F.3d 250, 252 (6th Cir.1994). This is particularly true "where the uncertainty induced by the statute threatens to inhibit the exercise of constitutionally protected rights." *Colautti v. Franklin, supra,* 439 U.S. at 391, 99 S.Ct. at 683 (citations omitted). Failure to satisfy this stringent standard necessitates that the law be struck as unconstitutionally vague even if the law "could conceivably have had some legitimate application." *Kolender, supra; see also Colautti, supra* (invalidating criminal abortion statute as impermissibly vague on its face even though it could conceivably have had constitutional applications); *Springfield Armory, supra,* 29 F.3d at 251–54 (invalidating statue on vagueness grounds under strict review applicable to criminal statutes).

▮ Finally, the lack of a *mens rea* or specific intent requirement in a statute which imposes criminal liability also may indicate that the statute is unconstitutionally vague. *Colautti v. Franklin,* 439 U.S. 379, 395, 99 S.Ct. 675. 685, 58 L.Ed.2d 596 (1979). As noted by the Supreme Court in *Colautti:*

> [T]he requirement of specific intent to do a prohibited act may avoid those consequences to the accused which may other wise render a vague or indefinite statute invalid.... The requirement that the act must be willful or purposeful may not render certain, for all purposes, a statutory definition of the crime which is in some respects uncertain. But it does relieve the statute of the objection that it punishes without warning an offense of which the accused was unaware.

439 U.S. at 395 n. 13, 99 S.Ct. at 685 n. 13 (citation omitted). In *Colautti,* the Court held that an abortion statute was vague and the vagueness of the statute was "compounded by the fact that the Act subjects the physician to potential criminal liability without regard to fault." 439 U.S. at 394, 99 S.Ct. at 685: *see also id.* at 401, 99 S.Ct. at 688 ("The lack of any scienter requirement

exacerbates the uncertainty of the statute."). Where a vague law has no scienter requirement, individuals cannot avoid being caught in its sweep even if they lack the "specific intent to commit an unlawful act." *Papachristou v. City of Jacksonville,* 405 U.S. 156, 163, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972).

The Michigan statute purports to ban "partial birth abortions", and, therefore, the Court's vagueness analysis must begin with the statute's definition of "partial birth abortion." As defined in the statute, a "partial-birth abortion" is an abortion in which the physician *"partially vaginally delivers a living fetus before killing the fetus and completing the delivery."* It is the key term "partial birth abortion" and the statutory definition of that term that Plaintiffs contend render the statute void for vagueness.

The testimony of the medical experts at trial—including that of Defendants' witnesses—demonstrates that the statutory prohibition against "partial-birth abortions" is ambiguous and susceptible to various interpretations. As all of the witnesses agreed, the term "partial-birth abortion" is not one found in the medical literature. Nor is it defined in the statute in medical terms. And, the "plain language" of the statute clearly left the physicians who testified confused as to its meaning and application. As Dr. Johnson testified, the statute's definition of partial birth abortion "is not entirely clear to me as a physician in terms of what that means." [5/6/97 Tr. p. 194.] The experts differed widely as to what they understood "partially vaginally delivers a living fetus" to mean. Drs. Evans, Christensen and Johnson all testified that it was not clear to them whether the term meant partially delivering an intact fetus or delivering a part of a fragmented fetus or both situations. As Dr. Johnson stated:

> [I]f you start off with a living fetus and then you partially deliver that fetus, as near as I understand the English language, that means that you deliver a part of that fetus. So that means you could deliver a part of it intact or a part of it not intact, at least as I understand the English language and the use of adverbs like this.

[5/6/97 Tr. p. 219.]

Dr. Christensen similarly found the definitional phrase "problematic". The problem,

as he described it, arises from the lack of medical meaning for the phrase. *Id.* at 21. Left then with common parlance as the only guide, he testified that to him, the phrase could mean "[e]ither part of the fetus has been removed or the whole fetus has been partially removed." *Id.* at 22.

Similarly, Dr. Evans understood the phrase to apply when "part of the fetus is extending out of the cervix while part of the fetus is still inside the uterine cavity, and that could be intact or it could be in separate different pieces." [5/5/97 Tr. p. 1 41.]

Even Defendants' experts, Dr. Giles and Dr. Cook, conceded that, although they personally believe that the statute only covers the partial removal of an intact fetus, they saw that some persons could interpret the phrase "partially vaginally delivers" as covering the removal of a dismembered portion of the fetus where there was still a fetal heartbeat. [*See* 5/7/97 Tr., Testimony of Dr. Giles at pp. 163, 201–20; Testimony of Dr. Cook at p. 251.]

Underlying the different readings of the statute to encompass the removal through the vagina of an intact fetus or a fetal part is the broad meaning given the term "delivery" in obstetrics. As Drs. Johnson and Evans testified, anything that is removed from the uterus is "delivered", whether it is a baby, a placenta or a fetal part. [See Testimony of Dr. Johnson, 5/6/97 Tr. pp. 194–95; Testimony of Dr. Evans 5/5/97 Tr. p. 141.] Thus, to "deliver" a limb or other part of a fetus that still has a heartbeat—which the experts all agreed would signify a "living fetus"—is to "partially deliver a living fetus" as that phrase in the statute is understood by Drs. Evans, Johnson and Christensen. To others, such as Dr. Cook, "deliver[y][of] a living fetus" cannot refer to the delivery of a "dismembered arm" or other fetal part, therefore, the phrase "partially delivers a living fetus" can refer only to the partial delivery into the vagina of a still intact fetus, part of which remains in the uterus. [*See* Testimony of Dr. Cook, 5/7/97 Tr. p. 251.]

Further, because of the confusion as to the statutory definition of "partial birth abortion", physicians do not know with the constitutionally requisite degree of certainty which abortion procedures are prohibited under Act. For those doctors—such as Drs. Johnson, Evans and Christensen—who understand the term "partially vaginally delivers a living fetus" to cover the partial removal of a fetus while its heart is still beating, whether in whole or in part, the statute could outlaw conventional dilatation and evacuation procedures in which the fetus is evacuated part by part, as well as intact D & E procedures.

Defendants argue in their Post–Trial Brief that the definition of "partial birth abortion" in subsection (5)(c) of the Michigan statute must be read in conjunction with the definition of "fetus" in subsection (5)(b) of the statute and that reading these two subsections together makes it clear that the statute bans only "intact" D & E procedures.

"Fetus" is defined in the statute as "an individual organism of the species homo sapiens at any time before complete delivery from the pregnant woman." M.C.L. § 333.17016(5)(b). Defendants argue that the phrase *"complete delivery"* in the definition of fetus makes it clear that the Legislature intended the phrase "partially vaginally delivers a living fetus" to mean a delivery of an intact fetus.

The problem with this argument is that neither Defendants nor anyone else offered testimony at trial concerning the clarity of the definition of "partial birth abortion" when read in tandem with the definition of "fetus". Thus, Defendants' argument has no evidentiary support in the record. In any event, the Court does not believe that the phrase "complete delivery" in the definition of "fetus" does anything to clarify the definition of "partial birth abortion". Defendants reading ignores the words preceding "complete delivery", i.e., *"at any time prior to complete delivery "*. As the Court reads the definition of fetus with its phrase "at any time prior to complete delivery" in conjunction with the definition of "partial birth abortion", the prohibition of the statute is triggered when the fetus is killed at any time before there has been *a complete evacuation* of the uterus. All that "at any time before complete delivery" adds to the definition of partial birth abortion is to make clear that when part of a fetus—be it part of an intact fetus or a dismembered part of a fetus—has been delivered out of the cervix into the vagina, if the

fetus is killed while part of it is still inside the uterine cavity (i.e., before complete evacuation of the uterus, or before "complete delivery of the fetus"), the statute is triggered. The ambiguity as to whether the statutory ban only applies if the fetus is intact, or whether it may also apply if the fetus is fragmented, is not in the least alleviated by the statute's definition of "fetus".

The legislative history of the statute further demonstrates the lack of support for Defendants' contention that the Legislature intended that the statute ban only intact D & E procedures. Both at the Committee level and in the full House, proposed amendments were *rejected* which would have made clear that the statute would only ban a single procedure and that the ban would only be triggered when there is a partial vaginal delivery of an *intact* fetus.[25]

Moreover, even if the statute were to be construed as covering only intact D & E

---

**25.** The full House and the House Standing Committee on Human Services specifically rejected an amendment that would have replaced the "partially vaginally delivers a living fetus before killing the fetus and completing the delivery" language in the definition with *"performs a totally intact vaginal delivery of a fetus up to the level of the fetal head followed by an incision into the fetal skull to remove the contents of the skull to complete the procedure"*. *See* House Journal at 1334–35; May 23, 1996 Minutes of the Committee on Human Services, p. 7. The full House also rejected an amendment that would have replaced the term "partial-birth abortion" throughout the bill with *"an intact dilatation and extraction"*, and an amendment that would have added a paragraph to provide *"This section does not prohibit medical procedures other than intact dilatation and extraction that may be medically necessary to perform a third trimester abortion"*. *See* House Journal at 1338–40.

Other portions of the legislative history demonstrate that even the proponents of the "partial birth abortion" legislation did not know what was being banned. For example, in a memorandum issued less than one week before the House vote, the Department of Consumer and Industry Services, the agency responsible for Occupational and Professional Regulation, including enforcement of professional license revocation, voiced its support for the bill understanding that "[T]he term 'partial birth' abortion [means] an abortion in which the physician *induces a vaginal delivery,* terminates the life of the fetus and completes the abortion." *See* 5/21/96 Memorandum of Thomas C. Lindsay, III, Acting Director of the Occupational and Professional Regulation and Kathleen M. Wilbur, Director of the Department of Consumer and Industry Services, [Stipulated Legislative History, Plaintiffs' Ex. 29, pp. 79–80.] (The Memorandum further indicates that the Department's understanding of the bill was that only "pregnancies beyond the 20th week" were covered by the bill and that the bill contained an exception which provided that the ban against performing a partial-birth abortion did not apply "when a fetus is found to be severely malformed and *non-viable* outside the womb." *Id.* However, no limitation as to gestational age or viability of the fetus and no exception for fetal malformation was ever provided in any of the drafts of the bill.) *See also,* the House Republican Bill Analysis, offered one day before the House floor vote (May 28, 1996) which characterized the banned "partial birth abortion" procedure as "a procedure performed *in the last trimester of pregnancy,* involv[ing] delivery of all but the head of a fetus, then inserting a hole in the back of the fetus' skull and vacuuming out its brain tissue." [Stipulated Legislative History, Plaintiffs' Ex. 29, p. 87.] *See also,* House Legislative Analysis of H.B. 5889 ("Proponents of the bill say that partial-birth abortion is very close to infanticide. They describe a gruesome procedure whereby *a nearly full-term fetus is partially delivered* and then killed by means of having its skull crushed or incised before the delivery is completed.") [Stipulated Legislative History, Plaintiffs' Ex. 29, p. 89.]

The argument made by proponents of the ban that it is intended to apply only to post-viability procedures is undermined not only by the language of the statute itself, but also by the fact that both the House and the Senate specifically rejected amendments that would have limited the scope of the ban to post-viability procedures. Further, if the statute was intended to ban only "post-viability" third trimester abortions, as a number of the proponents of the ban indicated, the "partial birth abortion" statute is entirely unnecessary because existing Michigan law already bans post-viability abortions, except where necessary to preserve the life or health of the mother. *See, People v. Bricker,* 389 Mich. 524, 208 N.W.2d 172 (1973), in which the Michigan Supreme Court construed Michigan's general ban on performing abortions ("procuring miscarriages") in M.C.L. § 750.14 in light of *Roe v. Wade,* and held:

> [W]e construe § 14 of the penal code to mean that the prohibition of this section shall not apply to "miscarriages" authorized by a pregnant' woman's attending physician; the effectuation of the decision to abort is also left to the physician's judgment; *however, a physician may not cause a miscarriage after viability except where necessary to preserve the life or health of the mother.* 208 N.W.2d at 175.

As the medical experts at trial testified, it is accepted in the medical community that the cutoff for viability is 24 weeks Imp, i.e., at the start of the third trimester. All of the doctors who testified on this issue stated that abortions are

procedures, there are serious problems of ambiguity arising out of the lack of an intent standard because a doctor may begin a procedure by intending to do a conventional D & E but end up doing an "intact" D & E, thus triggering the statute even under Defendants' construction of it. The testimony of Drs. Johnson, Evans, Christensen and Westoff illustrates the problem. When a physician sets out to perform a conventional D & E intending to dismember the fetus and remove it in parts, sometimes when the physician reaches into the uterine cavity, to dismember a fetus and remove a part, the entire fetus, still intact, may pass through the cervix up to the point of the head. [Testimony of Dr. Johnson, 5/6/97 Tr. p. 236; Testimony of Dr. Evans, 5/5/97 Tr. p. 119; Testimony of Dr. Christensen, 5/6/97 Tr. p. 24; 5/1/97 De bene esse deposition testimony of Dr. Westoff, p. 46.] Because of the large size of the fetal head in the second trimester, it is not always possible to remove it without crushing the skull or evacuating the intracranial contents by puncturing the skull and suctioning out the contents, thereby killing the fetus and triggering the statute. Similarly, as Drs. Evans and Johnson testified, the same situation arises in some induction procedures. [See Testimony of Dr. Johnson, 5/6/97 Tr. pp. 203–205; Testimony of Dr. Evans, 5/5/97 Tr. p. 210.]

As all of the doctors observed, there is no mention in the Act of a physician violating the statute only if he "intentionally" performs an intact D & E procedure, and this lack of an explicit intent requirement, as the testimony illustrates, makes the statute particularly susceptible to ambiguous interpretation and unpredictable enforcement.

Defendants argue in their Post–Trial Brief that the statute does contain an intent requirement, both by implication and by reference. Defendants begin by arguing that before *Roe v. Wade,* Michigan had a statute prohibiting abortions in this state which prohibited the *"wilful* [sic] employ of any in-

strument 'with the intent to procure the miscarriage.'" M.C.L. § 750.14. Defendants contend that "[t]he Legislature is presumed to be cognizant of existing law and harmonize proposed legislation of existing law." *See,* Defendants' Post–Trial Brief, p. 30. Therefore, they argue that because the partial birth abortion statute, like Section 750.14, is directed at physicians, it "includes, by implication, the same intent found in the more general prohibition against abortions [as provided in Section 750.14]." [Defendants' Post–Trial Brief, pp. 29–30.]

The principal problem, of course, with Defendants' "intent by implication" argument is that as a result of *Roe v. Wade,* Michigan's total ban against abortions was invalidated. Defendants rely on the Michigan Supreme Court's first post-*Roe v. Wade* decision involving Section 750.14 in *People v. Bricker,* 389 Mich. 524, 208 N.W.2d 172 (1973). Although acknowledging that the Supreme Court held in *Bricker* that, in light of *Roe,* Michigan's statutes prohibiting abortions should be invalidated or modified to the extent necessary to comply with the Supreme Court's federal constitutional mandate, Defendants rely on dicta in *Bricker* in which the Supreme Court merely stated "now that the United States Supreme Court has spoken concerning the constitutionality of state abortion laws, *we seek to save what we can of the Michigan statutes."* 389 Mich. at 528–29, 208 N.W.2d at 174. Defendants contend that, by this statement, although the prohibition against pre-viability abortions was invalidated by *Roe,* Michigan preserved the "intent" requirement of § 750.14, such that, by implication, that preserved "intent" is included in the new "partial birth abortion" statute. Defendants are obviously grasping at straws in arguing that when a statute prohibiting the intentional doing of a specific *act* is invalidated, the "intentional" part of the invalidated statute is preserved when, years later, the Legislature enacts another statute on a relat-

---

illegal in Michigan after 24 weeks (except where necessary to preserve the life or health of the mother).

Indeed, prosecutions for violating Michigan's existing ban on post-viability abortions have al-

ready commenced. Dr. Evans, in fact, indicated while testifying in this case that he has been called to testify as a witness against another doctor for performing post-viability abortions in violation of existing Michigan law.

ed topic.[26]

■ Defendants also argue that because the definition of "abortion" in subsection (5)(a) of the "partial birth abortion" statute has an "intent" element ("the *intentional* use of an instrument, drug, or other substance or device to terminate a woman's pregnancy"), since the word "abortion" is part of the phrase "partial birth abortion", the definition of partial birth abortion "subsumes within it the definition of 'abortion'." [Defendants' Post–Trial Brief, pp. 32–33.] It is not enough, however, to pass constitutional muster, that the statute define "abortion" generally, as an intentional act of a physician. "Intentional" pre-viability abortions are legal in Michigan. *People v. Bricker*, 208 N.W.2d at 175. Rather, it is the requirement of **intent to perform the unlawful procedure itself** that is lacking. *See Papachristou v.*

*City of Jacksonville*, 405 U.S. 156, 163, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972) (where a vague law has no scienter requirement, individuals cannot avoid being caught in its sweep even if they lack the "specific intent to commit an unlawful act.") *See also, Colautti v. Franklin, supra; Planned Parenthood v. Miller* 63 F.3d 1452, 1463–65 (8th Cir.1995): *Jane L. v. Bangerter*, 61 F.3d 1493 (10th Cir.1995), *rev'd in part on other grounds,* ——— U.S. ———, 116 S.Ct. 2068, 135 L.Ed.2d 443 (1996). *on remand,* 102 F.3d 1112 (10th Cir. 1996). *cert. denied,* ——— U.S. ———, 117 S.Ct. 2453, 138 L.Ed.2d 211 (1997).[27]

But, perhaps the most compelling indication of the vagueness of the statute is the testimony of Defendants' own experts, Dr. Giles and Dr. Cook. At trial, Dr. Giles originally took the position that the Michigan

---

**26.** What the Michigan Supreme Court actually "preserved" in *Bricker* was the ban on abortions *after viabilty* except where "necessary, in [the physician's] medical judgment, to preserve the life or health of the mother." 208 N.W.2d at 175 (interpreting Michigan's general ban on all abortions in § 750.14 to be consistent with *Roe v. Wade)*. Specifically, the Court stated:

> In light of the declared public policy of this state and the changed circumstances resulting from federal constitutional doctrine elucidated in *Roe* and *Doe [v. Bolton]*, we construe § 14 of the penal code to mean that the prohibition of this section shall not apply to "miscarriages" authorized by a pregnant woman's attending physician in the exercise of his medical judgment; however, a physician may not cause a miscarriage after viability except where necessary in his medical judgment, to preserve the life or health of the mother.

208 N.W.2d at 175.

**27.** Defendants also argued for an application of *United States v. Salerno*, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) in determining whether the partial birth abortion state is vague. In *Salerno*, the Supreme Court rejected a facial challenge to the constitutionality of the Bail Reform Act's provisions regarding pre-trial detention of persons charged with violations of certain crimes. In addressing the question of the constitutionality of the Act's pre-trial detention procedures, the Court balanced the defendant's "strong interest in liberty" against "the government's interest in preventing crime by arrestees", and determined that, to withstand a facial challenge to the Act, the Court needed only to find that the statutory procedures were constitutionally "adequate to authorize the pretrial detention of at least some [persons] charged with crimes, whether or not they might be insufficient in some

[other] particular circumstances." 481 U.S. at 751, 107 S.Ct. at 2103. Thus, in *Salerno*, the Court held that a statute may be subject to a facial challenge only if it can be shown that no set of circumstances exists under which the Act would be valid. *Id.* at 745, 107 S.Ct. at 2100.

Relying on the *Salerno* "facial challenge" rule (and the Court's request at the initial hearing on Plaintiffs' request for a temporary restraining order/preliminary injunction for briefing on the issue of applicability of *Salerno* versus the applicability of the "undue burden" standard set forth in *Planned Parenthood v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)), Defendants contend that to succeed with their claim that the partial birth abortion statute is unconstitutionally vague, Plaintiffs must show that the statute is "vague in all of its applications." Defendants have confused Plaintiffs' vagueness challenge with their "facial overbreadth" challenge to the statute. As discussed *infra*, the question of the applicability of the *Salerno* test arises in connection with Plaintiffs' overbreadth argument and whether, for purposes of Plaintiffs' claim that the statute is facially overbroad, the rule of *Salerno* should apply or whether that rule has been replaced by *Casey's* "undue burden" standard. The "void for vagueness" argument is an entirely separate issue for which the test, in its simplest terms, is whether the statute "give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly." *Grayned v. City of Rockford, supra*, 408 U.S. at 108, 92 S.Ct. at 2298. Defendants have not cited, and the Court has not found, any "void for vagueness" cases in which a statute or ordinance withstands a void for vagueness challenge and is found to be constitutional because the statute might not be vague in "some particular circumstances."

statute banned only the "intact D & E procedure." However, it became apparent that Dr. Giles was not very familiar with the language of the Michigan statute, and he admitted that his frame of reference with respect to statutes banning "partial birth abortion" procedures was his familiarity with the Ohio statute as a result of his involvement with the federal court challenge of that statute.[28] "I ... never read [the Michigan statute] as anything more than a very similar statute in Ohio that precludes doing a dilation of the cervix, bringing the buttocks and feet down, pulling the baby out to the level of the head, and then, intentionally terminating life." [5/7/97 Tr. pp. 164–65.] When the Court pointed out to Dr. Giles that the Michigan Legislature specifically considered and rejected the definition given by Dr. Giles in favor of the definition used in the statute, Dr. Giles admitted that that would give him greater pause to state that the Michigan statute only banned intact D & Es. "The language here is much more broad and vague than I think it ought to be personally [to convey that only intact D & Es are covered.]" *Id.* at 165.

Beyond the fact that Dr. Giles readily acknowledged that some physicians could read the statute as applying when the fetus was only partially delivered into the vaginal canal, Dr. Giles was equally candid when the Court queried him as to whether he would feel more comfortable with his original "intact fetus, only" position if the Legislature had either put the word "intact" into the statute, or put a comma after the word "partially". In response, Dr. Giles commented, "With all due respect, Your Honor, I would kind of like

to reword [the statute] myself." [5/7/97 Tr. p. 170].

On re-direct examination, Defendants' counsel, without success, attempted to have Dr. Giles retract or modify his testimony:

Q [by Mr. McDaniel]: Under the Michigan definition as you've read there, Doctor, if we've had testimony from Dr. Doe that when he does an intact D & E ... that he pulls the fetus down intact and then decides whether to crush the skull or to first suction out the contents, would either of those alternatives be covered by the statute?

A [by Dr. Giles]: Yes. I think they would.

THE COURT: *That, of course, does not mean that the statute might not cover other things as well, correct?*

A: *That's right, Your Honor.*

MR. McDANEL: One follow up, Your Honor?

THE COURT: I figured that.

\* \* \*

Q [by Mr. McDaniel]: *In your opinion, Doctor, what is meant by the phrase "a living fetus" in the statute?*

A: I think that it means a fetus that is still viable up to that point in time.

THE COURT: That it is viable?

A: Well, depending on gestational age. "Potentially viable" meaning having a heartbeat....

THE COURT: You don't mean viable—

A: To ultimate survival, no, not unless it's 23, 24 weeks or more.

THE COURT: But *by "living", you mean having a heartbeat?*

**28.** Dr. Giles testified as an expert witness in the federal court challenge to the Ohio partial birth abortion statute. The Ohio statute prohibits the use of the "Dilation and Extraction (D & X) procedure" (which as indicated above, is another title given to the "intact D & E procedure"). The Ohio law defined the banned "D & X procedure" as:

[T]he termination of a human pregnancy by purposely inserting a suction device into the skull of a fetus to remove the brain. "Dilation and extraction procedure" does not include either the suction curettage procedure of abortion or the suction aspiration procedure of abortion.

O.R.C. § 2919.15(A).

Although as indicated, the Ohio statute is more narrowly tailored than the Michigan law, after hearing the testimony of several physicians, the District Court for the Southern District of Ohio enjoined enforcement of the Ohio law finding it void for vagueness because it found that the definition of the banned D & X procedure "appears to encompass the purportedly allowable [conventional] D & E procedure as well ... this definition is unconstitutionally vague as it does not provide physicians with fair warning as to what conduct is permitted, and what conduct will expose them to criminal and civil liability." *Women's Medical Professional Corp. v. Voinovich,* 911 F.Supp. 1051, 1067 (S.D.Ohio 1995).

A: *Yes.*

\* \* \*

Q [by Mr. McDaniel]: *If you were to partially vaginally deliver a living fetus,* Doctor, in your interpretation of the statute, *what have you accomplished?*

A: *You have brought a part of the fetal anatomy intact outside the vagina.*

[5/7/97 Tr. pp. 201–204 (emphasis added).]

The testimony of Defendants' other witness, Dr. Cook, also demonstrates ambiguity as to the statutory meaning of "partially vaginally deliver[ing] a living fetus":

A [by Dr. Cook]: I read this [statute] as meaning the fetus intact. When they say "partially vaginally delivers a living fetus", to me that means an intact fetus. . . .

THE COURT: Do you believe that some physicians could read it [as encompassing a dismembered fetus], however?

A: I suppose they could. That was not my reading of it, but I suppose it's possible.

[5/7/97 Tr. at 250–251.]

█ As noted, this ambiguity is further compounded by the lack of an intent requirement.[29] Absent an intent requirement, the statute leaves physicians at risk of violating its terms virtually every time they perform an abortion after the first trimester. As the doctors testified, they cannot control the specific progression of a convention D & E or an induction abortion, and either of these procedures can, inadvertently, turn into an intact D & E through no fault of the physician.

In view of these considerations, the Court reaches the inescapable conclusion that the language of the definition of "partial birth abortion" in the Michigan statute is hopelessly ambiguous and not susceptible to a reasonable understanding of its meaning. Physicians looking to its language for direction as to what procedures are proscribed by the law simply cannot know with any degree of confidence what conduct may give rise to criminal prosecution and license revocation. Because the statutory definition of the banned procedure is ambiguous and because this language permeates the statute and liability is premised on it, the entire statute must be declared void for vagueness.

## 2. *OVERBREADTH*

Overlapping the issue of "vagueness" is Plaintiffs' contention that the statute is unconstitutionally overbroad on its face because it sweeps within its proscription substantially all second-trimester pre-viability abortion procedures, which under existing Supreme Court precedent, are protected by the Constitution.

The traditional "overbreadth" doctrine was developed in the context of cases involving the First Amendment. Under the overbreadth doctrine, litigants may facially challenge a statute on the ground that it is overbroad—i.e., that the statute "purports to reach protected, as well as unprotected" activities. *Broadrick v. Oklahoma,* 413 U.S. 601, 610, 93 S.Ct. 2908, 2914, 37 L.Ed.2d 830 (1973). Generally, to invoke the overbreadth doctrine in a facial challenge to a legislative act,

> the challenger must establish that no set of circumstances exists under which the Act would be valid. The fact that the [act] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid.

*United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987).

Applying the foregoing principles, the *Salerno* Court rejected a facial challenge to the Bail Reform Act of 1984:

> [W]e may dispose briefly of respondents' facial challenge to the procedures of the Bail Reform Act. To sustain them against

---

**29.** The Court notes that in considering language virtually identical to the Michigan statute at issue here, the U.S. Senate adopted an amendment premising liability upon the physician's specific intent to deliver the fetus into the vagina with the purpose of performing a procedure the physician knows will kill the fetus. Although the Court cannot, of course, pass upon whether this amendment would cure the constitutional vagueness problems of the Michigan statute's language, it is instructive that the U.S. Senate was obviously sensitive to the constitutional problems raised by the lack of an intent standard. *See* footnote 38, *infra,* for a more complete discussion of the federal statute.

such a challenge, we need only find them "adequate to authorize the pretrial detention of at least some [persons] charged with crimes, whether or not they might be insufficient in some particular circumstances."

*Id.* at 751, 107 S.Ct. at 2103 (citations omitted).

Five years after *Salerno*, however, the Supreme Court delivered its decision in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) and in that case, it appears that the Supreme Court established a new rule for facial overbreadth challenges in the abortion context. At issue in *Casey*, was the facial challenge brought by several abortion clinics and a doctor to five provisions of the Pennsylvania Abortion Control Act of 1982: the statute's "medical emergency" definition; the 24–hour informed consent requirement; the spousal notification requirement; the parental consent requirement for minors; and the statute's record-keeping and reporting requirements. The plurality struck down the statute's spousal notice provision as unconstitutionally overbroad, but upheld the other challenged provisions.

In reaching its decision to strike down the spousal notice provision, the *Casey* plurality did not invoke the *Salerno* rule requiring a showing that "no set of circumstances exists under which the [provision] would be valid". Rather, it concluded that the spousal notice provision was facially invalid because **"in a large fraction of the cases in which [the provision] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion."** *Casey*, 505 U.S. at 895, 112 S.Ct. at 2830.[30] In reaching this conclusion, the plurality specifically rejected the State's argument that the provision should be evaluated in light of its impact on all women seeking abortions. *Id.* at 894–95, 112 S.Ct. at 2829–30. The State had argued that for the vast majority of women seeking abortions, the law would impose almost no

burden because relatively few women who seek abortions are married and because most of those who are married notify their husbands. *Id.* at 894, 112 S.Ct. at 2829. Thus, the State argued that the effects of the spousal notification provision were "felt by only one percent of the women who obtain abortions." *Id.*

Although the plurality accepted the State's assertion that the statute would impact only one percent of the women who obtain abortions, without even mentioning the *Salerno* test, it rejected the State's argument that this saved the statute from an overbreadth challenge:

> The analysis does not end with the one percent of women upon whom the statute operates; it begins there. Legislation is measured for consistency with the Constitution by its impact on those whose conduct it affects.... The proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant.

*Id.*

Consequently, the plurality considered the provision's likely impact on the small percentage of married women who would elect not to notify their husbands of their intent to seek an abortion and who would not qualify for one of the exceptions to the requirement. *Id.* at 895, 112 S.Ct. at 2829–30. Because the provision would likely deter a large fraction of these women from obtaining an abortion, the Court held it was invalid as an undue burden on a woman's abortion rights. *Id.*

The only reference to the *Salerno* rule appeared in Chief Justice Rehnquist's dissenting opinion, which Justices White, Scalia and Thomas joined. In explaining how he would have evaluated the spousal notice provision, the Chief Justice observed:

> [I]t is not enough for petitioners to show that in some "worst-case" circumstances the notice provision will operate as a grant of veto power to husbands. Because they

---

**30.** Justices O'Connor, Kennedy, Souter and Stevens adopted the "large fraction of cases" standard. Although Justice Blackmun did not specifically adopt the standard, he accepted it, and concurred in the resulting determination, based

upon application of this standard, that the spousal notice provision of the statute was facially invalid. 505 U.S. at 925, 112 S.Ct. at 2845 (Blackmun, J. concurring in part).

are making a facial challenge to the provision, they must "show that no set of circumstances exists under which the [provision] would be valid."

*Id.* at 972–73, 112 S.Ct. at 2870 (Rehnquist, C.J., dissenting) (citations omitted). The Chief Justice then concluded that the plaintiffs had failed to make the required showing.[31]

In the years since *Casey* was decided, three of the four circuits which have addressed overbreadth challenges to abortion statutes have concluded that *Casey* established a new standard. The Third, Eighth and Tenth Circuits have concluded that *Casey* did replace *Salerno*. *See, Casey v. Planned Parenthood,* 14 F.3d 848, 863 n. 21 (3rd Cir.1994); *Planned Parenthood v. Miller,* 63 F.3d 1452, 1458 (8th Cir.1995); and *Jane L. v. Bangerter,* 102 F.3d 1112, 1115 (10th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 2453, 138 L.Ed.2d 211 (1997). Only

the Fifth Circuit has disagreed and has held that *Casey* did not change the standard. *See Barnes v. Moore,* 970 F.2d 12, 14 n. 2 (5th Cir.1992).

However, it should be noted that *Barnes* was decided less than two months after *Casey.* Furthermore, in reaching the conclusion that *Casey* did not overrule *Salerno,* the *Barnes* court relied solely upon Justice Rehnquist's *dissent* in *Casey.* Hence, reliance upon *Barnes* would be tenuous. Moreover, in a more recent case, the Fifth Circuit appears to have changed its view. In *Causeway Med. Suite v. Ieyoub,* 109 F.3d 1096 (5th Cir.1997), the Fifth Circuit recognized that the Supreme Court appeared to have "tempered the *Salerno* standard" by suggesting that an abortion law is facially invalid if it creates a substantial obstacle in a large fraction of cases in which it is relevant. *Id.* at 1102.[32]

**31.** Although perhaps presumptuous, this Court would observe that neither the *Salerno* test nor the *Casey* test seems satisfactory. On the one hand, to hold, as *Salerno* does, that a statute is not constitutionally overbroad if the statute operates permissibly on any single conceivable set of circumstances impacted by it ignores the realities of life; if a statute brings within its prohibitive sweep 99 percent of activities which would be protected by the Constitution, the statute gives too little breathing room for the exercise of constitutionally protected rights. This is particularly true where federal courts are passing on the constitutionality of state statutes, because, as noted earlier in this Opinion, federal courts are not free to give a limited, narrowing construction to state laws and, thereby, remedy its constitutional defects by carving out and establishing as law only a narrow application of the statute. *Hynes v. Mayor of Oradell, supra,* 425 U.S. at 622, 96 S.Ct. at 1761–62. Rather, because of federalism concerns, federal courts must take state laws as they find them and cannot supply their own meaning to state statutes or local ordinances. *Record Revolution No. 6. Inc. v. City of Parma, supra,* 638 F.2d at 926. Thus, even if the great bulk of activities within a statute's purview are constitutionally protected, a federal court is, nevertheless, not free to declare that, irrespective of the statute's facial breadth, that activity remains unaffected by the statute.

On the other hand, to focus on "worst case" scenarios (to borrow the Chief Justice's phrase) and ignore the fact that a statute permissibly regulates 99 percent of the activity within its sweep, as *Casey* appears to do, gives a statute too little breathing space and ignores and devalues important principles of federalism and judicial deference to the policy branches of our govern-

ment. A rule which frees a federal court to focus on the "what if" scenarios or marginal cases, and ignores the *true* impact of a law, openly invites judicial usurpation of the democratic policymaking function and inappropriate intrusion of the Federal judiciary into State lawmaking.

Rather, it seems a common sense approach should be utilized in which the focus is on the heartland of activities within a statute's sweep. If a statute would operate to prohibit the exercise of constitutionally protected rights in a substantial percentage of cases, that statute should be declared unconstitutional. On the other hand, if the statute operates permissibly in all but a handful of imaginable scenarios, it would seem that the bedrock constitutional principles of federalism and separation of powers demand judicial deference to the policy decisions of the people's elected representatives. The overbreadth doctrine cannot be a broad invitation to judicial ascendance over the will of the people and their elected representatives.

**32.** *See also, Armstrong v. Mazurek,* 94 F.3d 566 (9th Cir.1996), rev'd, —— U.S. ——, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997). In that case, the Supreme Court reversed a decision of the Ninth Circuit in a per curiam decision issued in connection with a ruling on a petition for certiorari, and in that ruling, it appears that the Supreme Court has reaffirmed the undue burden analysis as the appropriate standard in the abortion context. At issue in *Armstrong* was a motion for preliminary injunction in which the plaintiffs sought to enjoin as unconstitutional a Montana statute prohibiting licensed physicians-assistants from performing abortions. The District Court refused to grant the requested preliminary in-

In the Sixth Circuit, the only court to have dealt with the issue of which standard applies is the Southern District of Ohio in *Voinovich, supra* and the Court in that case followed the Third, Eighth and Tenth Circuits, as well as the one district court in the Seventh Circuit to address this issue,[33] and in the words of the Eighth Circuit in *Miller,* chose "to follow what the Supreme Court actually did—rather than what it failed to say" and applied the undue burden test. *Voinovich, supra,* 911 F.Supp. at 1061.

That the *Casey* "undue burden to a large fraction of women against whom the restriction operates" standard should be viewed as having replaced *Salerno's* "not-valid-under-any-circumstances" rule in the abortion context is further evidenced by the concurring opinion of Justice O'Connor (the author of *Casey),* in which Justice Souter, (another member of the *Casey* plurality), joined, in *Fargo Women's Health Organization v. Schafer,* 507 U.S. 1013, 1013, 113 S.Ct. 1668, 1668–69, 123 L.Ed.2d 285 (1993). Although agreeing with the majority's decision to deny the injunctive relief requested by the plaintiff in that case, Justice O'Connor commented on the district court's analysis of the facial constitutionality of the North Dakota abortion provisions and stated:

> junction, finding that the plaintiffs had not presented sufficient evidence that the statute presented an undue burden on a woman's right to an abortion. The Ninth Circuit reversed the denial of the preliminary injunction essentially without explanation of the basis for that reversal, stating only that the plaintiffs should be provided with a fair opportunity to establish that the statute presented an undue burden. The Supreme Court reversed the Appellate Court's decision because it had ignored the District Court's determination that there was insufficient evidence of undue burden. However, while the Supreme Court reversed the granting of a preliminary injunction, it did state that if, on remand, the plaintiffs established that the statute had the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion, injunctive relief might be appropriate.

**33.** *A Woman's Choice—East Side Women's Clinic v. Newman,* 904 F.Supp. 1434 (S.D.Ind.1995) ("[T]his court believes that *Casey* effectively displaced *Salerno's* application to abortion laws.") *Id.* at 1448.

**34.** The *Fargo* case was decided by the Eighth Circuit before *Miller.* In *Fargo,* the district court

I write separately . . . to point out that our denial of relief should not be viewed as signaling agreement with the lower courts' reasoning. In my view, the approach taken by the lower courts is inconsistent with *Casey.* In striking down Pennsylvania's spousal-notice provision, **we did not require petitioners to show that the provision would be invalid in all circumstances** . . . . [34]

507 U.S. at 1014, 113 S.Ct. at 1669.

■ Although this Court would not necessarily adopt the *Casey* standard were it free to ignore it and write its own test (see note 31, *supra),* this Court does agree with the majority of the courts that have addressed this issue and concludes that, at least in the abortion context, the *Casey* "large fraction" test has replaced the *Salerno* "no set of circumstances" test. Thus, because the Court must follow precedent, for purposes of Plaintiffs' facial overbreadth challenge to the Michigan partial-birth abortion statute, the test is whether "in a large fraction of the cases in which [the provision] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Casey,* 505 U.S. at 895, 112 S.Ct. at 2830.

and the court of appeals applied *Salerno.* 18 F.3d 526, 529. The next year, the Eighth Circuit revisited the issue in *Miller* and determined that *Casey* "effectively overruled *Salerno* for facial challenges to abortion statutes." 63 F.3d at 1452. The *Miller* court explained:

> We choose to follow what the Supreme Court actually did—rather than what it failed to say—and apply the undue-burden test. It is true that the Court did not expressly reject *Salerno's* application in abortion cases, but it is equally true that the Court did not apply *Salerno* in *Casey.* If it had it would have had to uphold Pennsylvania's spousal-notification law, because that law imposed "almost no burden at all for the vast majority of women seeking abortions." *Casey,* 505 U.S. at 892, 112 S.Ct. at 2829. Instead, the Court held that "[t]he proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Id.* . . . If the law will operate as a substantial obstacle to a woman's choice to undergo an abortion "in a large fraction of the cases in which [it] is relevant, . . . [i]t is an undue burden, and therefore invalid." *Id.*
> 63 F.3d at 1457.

## THE CASEY DECISION AND THE UNDUE BURDEN STANDARD

In *Casey,* by a narrow majority (5–4), the Court reaffirmed the essential holding of *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) that "[r]egardless of whether exceptions are made for particular purposes, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability." 505 U.S. at 879, 112 S.Ct. at 2821. The Court also reaffirmed *Roe*'s holding that "subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, or even proscribe, abortion, except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Id.*

However, a plurality of the Court abandoned the trimester framework of *Roe* [35] and its "rigid prohibition on all previability regulation," *id.* at 873, 112 S.Ct. at 2818, and "[t]o promote the State's profound interest in potential life" throughout pregnancy, *id,* at 878, 112 S.Ct. at 2821, replaced trimester framework with an "undue burden" analysis. Under this approach, a State may enact measures influencing a woman's abortion decision, provided that such measures do not impose an "undue burden" on the woman's right to choose an abortion. As defined by the plurality, *a law is invalid as an undue burden "if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability."* *Id.* at 878, 112 S.Ct. at 2821. The Court fleshed out this standard:

> [A] finding of undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus. A statute with this purpose is invalid because the means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it. And a statute which, while furthering the interest in potential

life or some other valid state interest, has the effect of placing a substantial obstacle in the path of the woman's choice cannot be considered a permissible means of serving its legitimate ends. In our considered judgment, an undue burden is an unconstitutional burden. *Understood another way, we answer the question, left open in previous opinions discussing the undue burden formulation, whether a law designed to further the State's interest in fetal life which imposes an undue burden on the woman's decision before fetal viability could be constitutional. The answer is no.* *Id.* at 877, 112 S.Ct. at 2820–21.

Thus. under *Casey,* states may not enact regulations which, prior to the fetus attaining viability, have "the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion." *Id.*

Left open to lower courts in the aftermath of the *Casey* undue burden test is the question of how it impacts upon statutes which purport to proscribe a specific abortion procedure, such as the one at issue here. The only Supreme Court case involving the constitutionality of a ban on a specific abortion procedure is *Planned Parenthood of Missouri v. Danforth.* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976). Although this case is a pre-*Casey* decision, the reasoning of the Court in *Danforth* foreshadows and substantially tracks the *Casey* "undue burden" analysis. In *Danforth,* the Supreme Court held that a Missouri statute banning the saline amniocentesis abortion procedure was unconstitutional. The district court record testimony demonstrated that the saline amniocentesis method was "one of the most commonly used in the nation after the first trimester" and was "safer, with respect to maternal mortality, than even continuation of the pregnancy until normal childbirth." 428 U.S. at 78, 96 S.Ct. at 2845. Thus, the Court reasoned that "as a practical matter, it forces a woman and her physician to terminate her pregnancy by methods more dangerous to her health than the method outlawed." *Id.* at 79, 96 S.Ct. at 2845. Therefore, the Court

---

**35.** Justices O'Connor, Kennedy, Souter and Stevens clearly abandoned the trimester approach in favor of the pre-viability/undue burden analysis, while Justice Blackmun, the author of the *Roe* trimester approach, clearly did not concur in rejecting it for the undue burden test.

concluded that Missouri ban on the procedure constituted *"an unreasonable or arbitrary regulation designed to inhibit, and having the effect of inhibiting the vast majority"* of second trimester abortions and, as such, *"[could] not withstand constitutional challenge."* *Id.*

Reading *Danforth* in conjunction with *Casey*, the District Court in *Voinovich* determined that post-*Casey*, the question the court had to answer in order to determine if the Ohio statute's ban on the D & X procedure was constitutional was whether there were safer alternative abortion procedures available in Ohio. The court explained:

> [I]f a ban on a specific [abortion] method were to place a substantial obstacle in the path of a woman seeking a pre-viability abortion—for example, if there were no safe and available alternative method of abortion—the ban would be an undue burden and therefore, unconstitutional. The issue, therefore, is whether in Ohio, there are safe and available alternatives to the D & X procedure, which is typically performed during the twentieth to twenty-fourth weeks of pregnancy, such that there would be no undue burden if the procedure were banned.

911 F.Supp. at 1067.

The court, therefore, proceeded to compare the D & X procedure to the induction, hysterotomy and hysterectomy procedures in terms of their impact on the health and life of the mother.

Relying on the testimony of various doctors, the court concluded that the D & X procedure posed less of a risk to maternal health than either a hysterotomy or a hysterectomy, both of which are major, traumatic surgeries. *Id.* at 1070. With respect to induction, the court also found that the D & X procedure appeared to pose less of a risk to

maternal health than induction procedures because induction

> require[s] the woman to go through labor, pose additional risks resulting from the injection of fluids into the mother, and cannot be used for every woman needing an abortion.

*Id.* at 1070.[36]

The court further stated that "even if induction procedures were as safe as the D & X procedure ... the requirement that a pregnant woman be hospitalized in order to undergo an induction procedure may also have a negative impact on the practical availability of abortions for women seeking pre-viability abortions." *Id.* at 1070–71. The court reasoned,

> First, hospitals may refuse to allow induction procedures on an elective basis, including those situations in which the woman wishes to abort a fetus with severe anomalies. Second, it may be psychologically daunting to undergo the induction procedure in the hospital environment. These practical problems may discourage women in their second trimester from exercising their right of seeking elective, pre-viability abortions or make it practically impossible to do so amounting to an undue burden on the right to seek a pre-viability abortion. In contrast, the D & X procedure can be performed on an outpatient basis within a much shorter period of time, and is not limited by either of these practical problems.

*Id.* at 1071.

Thus, the *Voinovich* court concluded,

> If this [D & X] abortion procedure, which appears to pose less of a risk to maternal health than any other alternative, were banned, and women were forced to use riskier and more deleterious abortion pro-

---

**36.** Although the court found that a regular D & E was not a reasonable alternative for an abortion after 20 weeks of pregnancy, because there was some testimony that a D & X is a "variation" of a D & E, it also compared the risks associated with D & Es and D & Xs. With respect to the D & E procedure, the court found that

> use of the D & X procedure in the late second trimester appears to pose less of a risk to maternal health than does the D & E proce-

dure, because it is less invasive—that is it does not require sharp instruments to be inserted into the uterus with the same frequency or extent—and does not pose the same degree of risk of uterine and cervical lacerations, due to the reduced use of forceps in the uterus, and do the removal of any need to crush the skull and remove it in pieces, which can injure maternal tissue.

*Id.* at 1070.

cedures, the ban could have the effect of placing a substantial obstacle in the path of women seeking pre-viability abortions, which would be an undue burden and thus unconstitutional under *Casey*. *Id.* at 1071.

Turning to the instant action, as this Court has indicated earlier in this Opinion, the testimony of the doctors in this case clearly established that the language of Michigan's "partial-birth abortion" statute would, in many instances, sweep within its proscription even conventional D & Es as well as "intact" D & E procedures. This distinguishes the record here from that in *Voinovich* where, for purposes of its over-breadth/undue burden analysis, the court construed the language of the Ohio statute as being limited to intact D & Es. The record in this case establishes that the Michigan statute would, contrary to Defendants' arguments, in many instances sweep within its proscription even conventional D & Es. Thus, the undue burden inquiry here must be even broader than in *Voinovich;* it is not simply whether there are safe and available alternatives to the intact procedure D & E procedure because the Michigan statute's ban reaches conventional D & Es, a procedure which the uncontroverted testimony at trial established accounts for at least 85% of all second trimester abortions in Michigan. If physicians were to stop performing conventional D & Es in order to avoid the Act's penalties, the effect would be to "prohibit the use of a method which the record shows is the one most commonly used [in Michigan] ... by physicians after the first trimester." *Danforth, supra,* 428 U.S. at 78, 96 S.Ct. at 2845.

Perhaps even more importantly, the testimony at trial clearly established that at 13 to 16 weeks of pregnancy, a D & E is essentially the only feasible abortion method. Should physicians be required to stop performing D & Es, the only remaining methods for post-first trimester abortions would be induction, hysterotomy, and hysterectomy. However, the essentially unanimous testimony at trial established that at 13 to 16 weeks of pregnancy, induction is not a feasible alternative. Therefore, for women at that stage of preg-

nancy, if physicians stopped performing D & Es, their only alternative method of abortion would be hysterotomy and hysterectomy, procedures which, based on the testimony of the experts at trial, the Court finds to pose serious health risks to the mother.

With respect to induction methods, the overwhelming evidence at trial established that there are many women for whom induction of labor in the second trimester is contraindicated and for these women, especially, the D & E is not only the preferred but also the only safe method of abortion. For example, as Dr. Johnson testified, for a woman with a prior classical caesarean scar or hysterotomy, "the risk of rupture to the scar would be so high as to contraindicate [an induction abortion] and to make a D & E procedure vastly, vastly safer." [5/7/97 Tr. p. 283.] Indeed, every physician but one who testified on this issue—including Dr. Cook—acknowledged contraindications to inductions.

If physicians stopped performing D & Es, the Act would relegate women who cannot have inductions to hysterotomy, a procedure that even Defendants' expert, Dr. Giles, acknowledged has such "very high complication rate[s]" as to have "been virtually abandoned," [5/7/97 Tr. p. 159], or hysterectomy, a procedure which ends a woman's childbearing capability completely and presents similar health risks. The record evidence on this point is overwhelming as it that establishes hysterectomies and hysterotomies are substantially more dangerous than D & Es. Epidemiological studies show that the overall mortality rate for pre-viability D & Es is 3.7 per 100,000, while the mortality rate for hysterectomies and hysterotomies is 51.6 per 100,000. *See* Lawson, et al, *Abortion Mortality, United States, supra.*

The only evidence Defendants offered to contradict this finding was Dr. Cook's testimony that after 20 weeks lmp, a D & E is riskier than a hysterotomy. However, Defendants offered no empirical or epidemiological evidence to support this contention and the statistical evidence of record completely refutes this claim: For D & Es performed after 20 weeks, the mortality rate is 11.9 per 100,000, while for hysterotomies performed

after 20 weeks, the mortality rate is 274 per 100,000. *See,* Lawson, et al, *Abortion Mortality, United States, supra.*

By contrast, the evidence at trial established that the D & E is one of, if not the, safest method for post-first trimester abortions. *See ACOG Technical Bulletin,* Plaintiffs' Ex. 3, p. 3; 5/1/97 de bene esse deposition of Dr. Westoff, p. 61; 5/6/97 Tr. p. 180 (Testimony of Dr. Johnson); 5/5/97 Tr. pp. 126–27, 149, 207 (Testimony of Dr. Evans); 5/7/97 Tr. p. 119 (Testimony of Dr. Giles).

To address this serious deficiency in their case, Defendants argue that no undue burden is imposed on women seeking post-first trimester abortions even if the statute reaches conventional D & Es because physicians could avoid violating the statute by ensuring fetal demise before commencing the D & E procedure. The testimony of the medical experts at trial indicated that the most common method of ensuring fetal demise is to attempt to inject the fetus with a toxic agent such as potassium chloride or digoxin. However, experts for both the Plaintiffs and the Defendants, as well as the Court's expert testified that these injections have serious potential health risks. With the injection comes increased risk of hemorrhage, infection, and even uterine necrosis. There is also the risk of missing the fetus and hitting instead the mother's bowel or a blood vessel, thereby increasing the risk of life-threatening infection or internal bleeding. Indeed, Dr. Johnson opined that where there is no independent medical reason to attempt to ensure fetal demise by injection, "the risks are not justified medically". [5/6/97 Tr. pp. 187–88, 210.]

Based upon the testimony of the medical experts, the Court finds that attempting to ensure fetal demise before commencing a D & E procedure does not eliminate the undue burden placed by the Michigan statute upon women seeking second trimester abortions. Quite the contrary, the Court finds that attempting to ensure fetal demise as argued by Defendants would operate as an additional undue burden because it would impose additional medical risks on women seeking abortions. *See, Danforth, supra,* 428 U.S. at 78, 96 S.Ct. at 2845 (by imposing gratuitous medical risks on women seeking abortions, the act imposes an undue burden).

To summarize the Court's findings from the evidentiary record, the Court finds that the Michigan "partial birth abortion" statute sweeps within its prohibition conventional D & Es; that D & Es constitute more than 85% of the post-first trimester abortions performed in Michigan; and that D & Es are safer than any other abortion procedure for a substantial number of women in that for pregnant women at 13 to 16 weeks of pregnancy, and for women for whom induction is contraindicated, D & E is the only safe abortion procedure.

Therefore, because *Casey* requires that, prior to viability, a banned procedure, to survive constitutional scrutiny, may not pose an undue burden to women seeking abortion by placing a substantial obstacle in their path, this Court must find that the Michigan "partial birth abortion" statute is facially overbroad because in a substantial percentage of cases in which the statute is implicated, it will operate as a substantial obstacle to a woman's choice to undergo an abortion. Indeed, because of the sweeping breadth of the statute, it would operate to eliminate one of the safest post-first trimester abortion procedures, a procedure which currently is used in more than 85% of the post-first trimester abortions performed in Michigan. If the D & E procedure were eliminated, many women, and particularly those at 13 to 16 weeks of pregnancy, would be left with no alternative other than hysterotomy or hysterectomy, far riskier procedures. Additionally, there are a number of women for whom inductions—an alternative generally available after 16 weeks—are contraindicated. They, too, would have no alternative other than hysterotomy and hysterectomy. To leave women with only far riskier alternatives to the D & E clearly imposes an undue burden on a woman's right to seek a pre-viability abortion.[37]

---

**37.** Additional evidence was presented at trial with respect to "undue burden", including increased price, fewer medical facilities available for abortions, increased burden of travel. In light of the Court's conclusion on a risk/alternative method analysis that the effect of the statute

As the Court in *Voinovich* found with respect to an even more narrowly-tailored and specifically defined statutory ban, where the second trimester alternatives to the banned procedure—induction methods, hysterotomies and hysterectomies—are not as safe as the procedure which the state seeks to outlaw, the law must be enjoined as unconstitutional under the undue burden analysis.

## CONCLUSION

Although this Court is always reluctant to disturb the policy decisions of the elected representatives of the people, in this case and on this record, the Michigan partial-birth abortion statute must be declared unconstitutional and enjoined because, under controlling precedent, it is vague and overbroad and unconstitutionally imposes an undue burden on a woman's right to seek a pre-viability second trimester abortion and this court lacks authority to attempt to redefine the statute to give it constitutional construction.[38]

Therefore,

IT IS HEREBY ORDERED that Plaintiffs' request for declaratory relief be, and

---

would be to place a substantial obstacle in the path of a woman seeking a second trimester abortion, the Court finds it unnecessary to engage in a balancing of the additional "undue burden" evidence presented by Plaintiffs.

**38.** Because the Court finds that the statute is vague and overbroad, and imposes an undue burden on a woman's right to seek an abortion, it is unnecessary for the Court to address Plaintiffs' additional argument concerning the constitutional sufficiency of the statute's exception. As the U.S. Supreme Court has repeatedly cautioned, federal courts should avoid unnecessary and broad constitutional adjudication. *See* generally, e.g., *Ashwander v. TVA.* 297 U.S. 288, 341–356, 56 S.Ct. 466, 480–487, 80 L.Ed. 688 (1936) (Brandeis, J. concurring); *American Foreign Service Association v. Garfinkel*, 490 U.S. 153, 161, 109 S.Ct. 1693, 1697–98, 104 L.Ed.2d 139 (1989).

Further, in reaching its decision, the Court reiterates that it does not decide this matter from a clean slate. Rather, the Court is constitutionally obligated to adhere to existing Supreme Court precedent. It matters not what the Court's personal views or opinions are concerning the procedure which the State is attempting to outlaw. In the Court's view, the intact D & E procedure is gruesome and inhumane and society, through its elected representatives, should be able to circumscribe its utility. Indeed, even Plaintiffs' expert, Dr. Doe, testified that the intact D & E is a particularly hideous procedure. [5/5/97 Tr. *54–55.*] ("This is destructive surgery.... It's bloody, it's destructive.... It is unpleasant." *Id.*) However, since the Supreme Court has delineated the parameters as to when and to what extent a State may regulate abortion practices—and lower courts are obligated to follow its mandate without attempting to creatively circumvent precedent—such a regulation must be carefully and precisely drawn.

The Court believes that the Michigan Legislature may constitutionally regulate abortion practice in Michigan, and specifically, that the Legislature can, consistent with *Casey* and other Supreme Court precedent, tailor an abortion regulation that would avoid the pitfalls of vagueness and overbreadth and pass constitutional muster. Indeed, as the Court noted previously (footnote 29), the U.S. Senate recently amended proposed federal partial-birth abortion legislation—which was, until the recent amendment, in all material respects identical to the Michigan legislation—because the reaction of the medical community to the proposed federal legislation convinced the sponsors of the bill that it would not withstand a vagueness and overbreadth challenge. The American Medical Association was concerned that conventional D & Es could be viewed as being covered by the proposed federal partial birth abortion ban, and that doctors could be prosecuted under the federal bill in situations where because of unforeseen circumstances in the course of a conventional abortion, they unintentionally could end up performing an intact D & E. *See* Katharine Q. Seele, *Medical Group Supports Ban on a Type of Late Abortion*, N.Y. TIMES, May 20, 1997. As Senator Santorum explained to the Senate in presenting "Santorum Amendment No. 290 ", the proposed amendment to the federal "partial birth abortion" bill was designed to address the AMA's concerns to the Senate:

> [What] this bill does ... is to tighten up the language on what we mean by partial-birth abortion.... [T]he AMA was concerned that, because the definition was not specific enough from their reading [as to what act was banned and], some zealous prosecutor could come out and accuse the doctor, who has not performed [a partial birth abortion]—does not intend to perform [such] an abortion ...—because of a complication, that he or she could be covered under this act.
>
> We have tightened up the language with mens rea, to use the legal term. That directs the mental state—as to what the doctor was doing....
>
> So we tightened that language up substantially to satisfy that. That kind of situation would no longer be covered under the act. Frankly, I don't believe it is covered under the original act. But this makes it crystal clear that it is not covered under the act.
>
> I think to the extent that we have made that clear and that it is positive to the extent that

hereby is, GRANTED, and the Michigan "Partial Birth Abortion" statute, Public Act No. 273, M.C.L. §§ 333.17016, 333.17516, 333.16221(*l*) and (m) and 333.16226, is declared unconstitutional.

IT IS FURTHER ORDERED that Plaintiffs' request for a preliminary and permanent injunction be, and hereby is, GRANTED.

IT IS FURTHER ORDERED that Defendants, their employees, agents and servants are hereby PERMANENTLY ENJOINED from enforcing any provision of Public Act 273, M.C.L. §§ 333.17016, 333.17516, 333.16221(*l*) and (m), and 333.16226.

we have put in the requisite mens rea for a criminal statute, *which arguably was somewhat vague in the original bill,* we have now done that. We have tightened it up."

143 Cong. Rec. § 4670–2671 (May 19, 1997).

Thus, the federal bill's definition of "partial birth abortion" (which until the Santorum amendment was identical to the Michigan definition) was amended to read:

As used in this section, the term "vaginally delivers a living fetus before killing the fetus" means deliberately and intentionally delivers into the vagina a living fetus, or a substantial portion thereof, for the purpose of performing a procedure the physician knows will kill the fetus, and kills the fetus.

1997 Cong. Quarterly H.R. 1122 (March 21, 1997) (available on WESTLAW, CQ–BILLTXT Database).

The Court raises the Senate's attempt to cure the vagueness and overbreadth problems apparent in the original "partially vaginally delivers a living fetus" definition of "partial birth abortion" merely by way of example. Whether the Senate bill with the Santorum amendment is constitutionally sufficient in all respects is not for this Court to say here. However, it would appear to alleviate at least some of the concerns voiced by the physicians who testified in the instant action regarding the Michigan statute.

Unfortunately, in passing the statute in this case, the Michigan Legislature rejected every attempt to narrow and more specifically define the sweep of its statute, and as a result, produced a law clearly violative of Supreme Court precedent, leaving this Court no alternative but to declare it unconstitutional and enjoin its implementation.